STATE of Wisconsin, Plaintiff-Respondent,

v.

Jeramey J. BYRGE, Defendant-Appellant-Petitioner.

Supreme Court

*No. 97–3217–CR. Oral argument March 1, 2000.—Decided July 13, 2000.*

2000 WI 101

(Also reported in 614 N.W.2d 477.)

199

200

For the defendant-appellant-petitioner there were briefs and oral argument by *Steven P. Weiss*, assistant state public defender.

For the plaintiff-respondent, the cause was argued by *Sally L. Wellman*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

¶ 1. DAVID T. PROSSER, J. Jeramey J. Byrge (Byrge) seeks review of a published decision of the court of appeals, *State v. Byrge*, 225 Wis. 2d 702, 594 N.W.2d 388 (Ct. App. 1999), affirming a decision of the Circuit Court for Calumet County, Darryl W. Deets, Judge. The circuit court determined that Byrge was competent to stand trial for charges stemming from five felony offenses, including first-degree intentional homicide and hiding a corpse. After denying Byrge's motion to withdraw his no contest pleas but permitting him to withdraw the pleas of not guilty by reason of mental defect (NGI), the court found Byrge guilty and sentenced him to life imprisonment with a parole eligibility date of July 2, 2095.

¶ 2. Byrge unsuccessfully motioned the circuit court for post-conviction relief and subsequently sought review by the court of appeals. The court of appeals held that, under the deferential standard of review articulated by this court in *State v. Garfoot*, 207 Wis. 2d 214, 558 N.W.2d 626 (1997), an appellate court will not upset a circuit court's competency determination unless it is clearly erroneous. The court then affirmed the finding that Byrge was competent to proceed. The court also held that Byrge's pleas were not defective because a sentencing court is not required to inform defendants about parole eligibility. Finally, the court of appeals concluded that Byrge had not received ineffective assistance of counsel.

¶ 3. We frame three issues in this case. First, we revisit our holding in *Garfoot* and discuss the standard of review that applies to competency determinations. Second, we address the related issue, whether Byrge was competent to stand trial. Third, we examine Byrge's contention that the sentencing court was obligated to inform him about parole eligibility before it accepted his plea.

¶ 4. We hold that an appellate court reviewing a competency determination must use the methodology set forth in *Garfoot*. The findings of a circuit court in a competency to stand trial determination will not be upset unless they are clearly erroneous because a competency hearing presents a unique category of inquiry in which the circuit court is in the best position to apply the law to the facts. We find that the circuit court's decision that Byrge was competent to stand trial was not clearly erroneous because testimony at the competency hearing indicated Byrge was able to understand the proceedings and assist in his defense. We conclude that when a circuit court exercises its statutory option to fix a parole eligibility date, that date has a direct and automatic effect on the range of punishment. In this circumstance, parole eligibility information is a direct consequence of the plea. Although the circuit court had a duty to inform Byrge about the parole eligibility information before it accepted his plea, the State has met its burden to prove that Byrge nonetheless entered the plea knowingly, voluntarily, and intelligently. Accordingly, we affirm the decision of the court of appeals.

## FACTS

¶ 5. On Friday evening, August 19, 1994, Joan Wagner (Wagner) called her husband and told him that

she would see him after her shift ended at 11:00 p.m. at the Mirro Foley Company in Chilton, Wisconsin. Wagner expressed excitement about the new home on which the couple had closed that day. When she did not arrive home by 11:30 p.m., her husband retraced Wagner's route but was unable to locate her or her vehicle.

¶ 6. A Mirro Foley co-worker observed Wagner leaving the facility at 11:15 p.m. He noticed that a male who had been sitting near the parking lot approached Wagner and began talking with her. Wagner and the male walked towards Wagner's blue-over-gray 1989 Pontiac Grand Am, and she unlocked the passenger's side for the male. The two then drove off. The co-worker later identified Byrge as the person who accompanied Wagner.

¶ 7. At about 11:45 p.m., a Town of Rantoul resident, Chris Kopecky (Kopecky), heard what he presumed to be screams coming from the woods near his home. He also saw a blue Grand Am near the entrance to those woods and remembered the first letter and number of the license plates. Two days later, Kopecky's mother realized that his description of the Grand Am matched the vehicle discussed in a newspaper article detailing Wagner's disappearance. Kopecky then decided to check the woods. On August 23, 1994, he and two friends saw a puddle of blood just off a trail leading into the woods. The shoes and feet of a body rested 500 feet away. Law enforcement authorities arrived and discovered that the clothing on the body matched what Wagner had worn. An autopsy positively identified the body and revealed that Wagner had been stabbed four times.

¶ 8. Byrge, a 19-year old who lived next door to Wagner, was not seen in the Chilton area after August 19, 1994. Earlier in the week, Byrge had indicated that

he planned to take a bus trip to Colorado to visit a woman with whom he had a child. On August 23, 1994, Detective Jerry Pagel of the Calumet County Sheriff's Department, contacted Colorado authorities. They arrested Byrge in Highlands Ranch, Colorado. At the time of his arrest, Byrge was operating a blue and silver Pontiac Grand Am that bore Wisconsin plates. The vehicle was registered to Wagner and her husband. During a search of the Grand Am, Colorado authorities found a hunting knife with a curved, four-inch blade under the front driver's seat. The knife appeared to have blood and body tissue on it.

## PROCEDURAL HISTORY

¶ 9. On August 25, 1994, the Calumet County District Attorney filed a complaint alleging that Byrge caused Wagner's death. The complaint stated that Byrge committed the first-degree intentional homicide of Wagner, contrary to Wis. Stat. § 940.01(1) (1991–92),[1] a felony punishable by life imprisonment. The complaint also alleged that Byrge was responsible for four other crimes: (1) hiding a corpse contrary to Wis. Stat. § 940.11(2), (2) false imprisonment contrary to Wis. Stat. § 940.30, (3) bail jumping contrary to Wis. Stat. § 946.49(1)(b), and (4) operating a motor vehicle without the owner's consent contrary to Wis. Stat. § 943.23(2).

¶ 10. The Circuit Court for Calumet County conducted a preliminary hearing on September 16, 1994, and the court bound Byrge over for trial on all counts. The prosecution filed an Information that same day,

---

[1] All subsequent references to the Wisconsin Statutes are to the 1991–92 volumes unless indicated otherwise.

alleging the same charges as those set forth in the criminal complaint.

¶ 11.　Byrge pled not guilty to all charges on September 23, 1994. One month later, on October 24, 1994, Byrge amended his pleas to include NGI pleas to the charges. On November 15, 1994, Byrge entered pleas of no contest to all the charges except the false imprisonment charge. These modifications were not the result of a plea agreement. The NGI pleas remained intact as to all five charges.

¶ 12.　Three psychiatrists examined Byrge and filed reports with respect to the NGI pleas.[2] A court-appointed expert, Dr. Ralph K. Baker, examined Byrge on December 16. Dr. A.A. Lorenz, the psychiatrist selected by Byrge, evaluated him on March 3, 1995. The state's expert, Dr. Frederick Fosdal, interviewed Byrge on March 13.

¶ 13.　On March 20 Byrge's trial counsel, Joseph Norby (Norby), filed a motion requesting a competency evaluation. Nine days later the circuit court appointed Dr. Baker to examine Byrge for competency to stand trial.[3] Board certified in both psychiatry and neurology, Baker had evaluated more than 1,000 individuals

---

[2] Under Wis. Stat. § 971.16(3), the examiner's report must address:

> [T]he ability of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct with the requirements of law at the time of the commission of the criminal offense charged and,. . .whether the defendant needs medication or treatment and whether the defendant is not competent to refuse medication or treatment for the defendant's mental condition.

[3] A competency to proceed report sets forth "[t]he examiner's opinion regarding the defendant's present mental capacity to understand the proceedings and assist in his or her defense." Wis. Stat. § 971.14(3)(c).

for competency by the time of Byrge's hearing. Both Byrge and the State had placed Baker on their lists of psychiatrists acceptable as experts.

¶ 14. Baker evaluated Byrge for competency to proceed on April 14. During this examination, Byrge at first remained silent. Baker concluded that this silence was not the product of mental illness because Byrge agreed, albeit reluctantly, to speak with Baker after consulting Norby. Baker later testified that his findings from both this examination and the evaluation he had conducted with respect to the NGI pleas helped Baker determine many factors about Byrge that bore on competency.

¶ 15. The circuit court commenced the competency hearing on Friday, April 21, but postponed the proceeding until the following Monday because Dr. Baker was unavailable. When the hearing reconvened on April 24, the district attorney informed the court that Byrge had cut himself with glass earlier in the morning and that Byrge still might have glass in his mouth. Norby indicated that he and Byrge had had differences that day, culminating in a physical and verbal confrontation. Norby informed the court that he "never had been faced with a situation like this before," and that he was "at a loss as to how to proceed." The court and the attorneys agreed to bring Byrge into the courtroom under restraints and shackled to a wheelchair to protect courtroom personnel and Norby.

¶ 16. The court first addressed Byrge. Byrge did not respond when Judge Deets inquired whether he was competent or incompetent. Following the procedure set forth in Wis. Stat. § 971.14(4)(b), the court and the parties agreed that Byrge's decision to stand mute would require the court to find Byrge incompetent unless the State proved otherwise.

209

¶ 17. Dr. Baker was the only witness that testified at the competency hearing. Baker explained that a competency evaluation determines whether a defendant is capable of cooperating with an attorney and assisting with the defense. Baker found that Byrge was able to understand the proceedings and assist his attorney. Byrge, Baker observed, "was not mentally ill or malingering, he simply was distressed at the number of things that occurred in jail and the possibility of the trial." Baker found that Byrge was aware of both the charges against him and the many factors involved in the legal process.

¶ 18. Baker noted that Byrge had suicidal thoughts and that his actions indicated he might not care what happened to him. He observed that Byrge has a "great deal of anxiety and frustration and depression." But Baker also testified that this condition did not affect competency because Byrge was not "unable to cooperate with his attorney or in any way function at the trial."

¶ 19. Following Dr. Baker's testimony, the court asked Norby if he wished to present additional evidence. Norby stated:

> I am in a situation where I—if other counsel were representing Mr. Byrge, he may have wanted to call me as a witness, and I can't call myself and I can't testify. . .without violating the privilege that Mr. Byrge has with me, I am hamstrung, I really can't say anything. So if the court is asking if there is additional evidence I would like to offer, yes. But can I offer it at this point? I don't think I can.

Norby did not ask the court to call Dr. Lorenz or Dr. Fosdal as witnesses, and he did not call the court's attention to the reports from those two psychiatrists.

The reports of Drs. Lorenz and Fosdal were not entered as exhibits at the competency hearing, but were later received into evidence on the State's motion.

¶ 20. The court found that Byrge was competent to proceed. Thereafter, Byrge sought to withdraw his pleas of no contest to four of the offenses, and the court denied the motion. Byrge also sought to withdraw his NGI pleas. After conducting a colloquy with Byrge, the court allowed the withdrawal of the NGI pleas. Four charges thus remained to which Byrge had pled no contest, namely first-degree intentional homicide, hiding a corpse, bail jumping, and operating a motor vehicle without consent. The court found Byrge guilty on all four counts.

¶ 21. On June 21, 1995, the court sentenced Byrge to life imprisonment on the first-degree intentional homicide conviction, setting a parole eligibility date of July 2, 2095.[4] The court also imposed a consecutive five-year term on Byrge's conviction in the hiding a corpse offense and concurrent five-year terms on the bail jumping and operating without consent convictions.

¶ 22. Byrge filed a post-conviction motion, essentially presenting four bases of relief. First, Byrge challenged the trial court's finding that he was competent to proceed. Second, he claimed that he had received ineffective assistance of counsel with respect to both the competency proceeding and the withdrawal of the no contest pleas. Third, Byrge contended that the no contest pleas were not entered knowingly, voluntarily, and intelligently. Fourth, Byrge claimed that the plea colloquy was defective because the court never advised Byrge on the record that the maximum sen-

---

[4] Byrge was born on July 2, 1975.

tence was life in prison without possibility of parole. The circuit court rejected Byrge's claims.

¶ 23. Byrge appealed, arguing that an appellate court should utilize an independent standard when reviewing a competency determination and challenging the circuit court's determination that he was competent to stand trial. He also maintained that a sentencing court should be required to inform a defendant about parole eligibility before accepting a plea. Finally, Byrge asked the court of appeals to review his contention that his trial counsel was ineffective.

¶ 24. The court of appeals certified the case to this court, *Byrge* 225 Wis. 2d at 711 n.2, but we declined the certification. The court of appeals then affirmed the decision of the circuit court, holding that, under the precedent established by *Garfoot*, 207 Wis. 2d 214, a court of appeals is bound to employ the clearly erroneous methodology in reviewing a circuit court's competency determination. *Byrge*, 225 Wis. 2d at 711–12. Under that deferential standard, the court of appeals confined its review to the record of the competency hearing and affirmed the finding of the circuit court that Byrge was competent to stand trial. *Id.* at 713–14. The court of appeals also held that a sentencing court is not obligated to notify a defendant about parole eligibility information because parole eligibility is a collateral, not a direct, consequence of the plea. *Id.* at 716–17. Finally, the court held that Byrge had failed to establish a claim for ineffective assistance of counsel. *Id.* at 727.

¶ 25. In accepting Byrge's petition for review, this court declined to address the ineffective assistance of counsel claim. Order dated June 15, 1999, at 2.

¶ 26. We begin by addressing the purpose of competency determinations. Competence to stand trial is a cornerstone of our criminal justice system. *Drope v. Missouri*, 420 U.S. 162, 171–72 (1975). Anglo-American law long has recognized that incompetent defendants cannot be compelled to stand trial.[5] "[O]nly where a defendant is mentally competent will he be able to exercise effectively the rights which this society extends to persons charged with committing a crime." *State ex rel. Matalik v. Schubert*, 57 Wis. 2d 315, 322, 204 N.W.2d 13 (1973) (internal quotations omitted). Criminal prosecutions of incompetent defendants impinge on at least two principles of fundamental fairness. First, a person should not be tried *in absentia*. *Garfoot*, 207 Wis. 2d 214 at 221 (citation omitted). Although an incompetent defendant physically may be present in the courtroom, in reality he or she may not be able to participate in the defense.[6] *Drope*, 420 U.S. at 171. Second, an incompetent person may lack the ability to be informed about the charges and to confront the accuser. *Garfoot*, 207 Wis. 2d at 221; *Cooper v. Oklahoma*, 517 U.S. 348, 357 n.8 (1996).

¶ 27. Defendants who are tried and convicted while legally incompetent are deprived of a due process right to a fair trial. *Drope* 420 U.S. at 172; *Pate v.*

[5] *See generally State ex rel. Matalik v. Schubert*, 57 Wis. 2d 315, 321, 204 N.W.2d 13 (1973) (quoting 4 Blackstone, *Commentaries* *24, *25 (1897)); *Cooper v. Oklahoma*, 517 U.S. 348, 356–57 (1996).

[6] *See also* Luke Stephen Vadas, Casenote, *Godinez v. Moran: An Insane Rule for Competency?*, 39 Loy. L. Rev. 903, 906 (1994).

*Robinson*, 383 U.S. 375, 378, 385 (1966). Consequently, both federal and state courts permit the suspension of a criminal proceeding against an incompetent accused person. *Matalik*, 57 Wis. 2d at 321–22. Under federal case law, the due process test for determining competency considers whether the defendant: (1) "has sufficient present ability to consult" with his or her lawyer "with a reasonable degree of rational understanding;" and (2) "has a rational as well as factual understanding of the proceedings." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). Thus, a defendant is incompetent if he or she lacks the capacity to understand the nature and object of the proceedings, to consult with counsel, and to assist in the preparation of his or her defense. *Drope*, 420 U.S. at 171.

¶ 28. In Wisconsin, the trial of an incompetent defendant also violates state law.[7] Wisconsin Stat. § 971.13(1) codifies the due process test set forth in *Dusky*, providing that, "No person who lacks substantial mental capacity to understand the proceedings or assist in his or her defense may be tried, convicted, or sentenced for the commission of an offense so long as the incapacity endures." *See Garfoot*, 207 Wis. 2d at 222. This two-part "understand-and-assist" test constitutes the core of the competency-to-stand-trial analysis.

¶ 29. Wisconsin Stat. § 971.14 amplifies the basic rule of the understand-and-assist test by setting forth

---

[7] Because an incompetent defendant's right not to stand trial is rooted deeply in constitutional principles, individual states may not impose procedural burdens that are incompatible with the protections offered by the Due Process Clause of the United States Constitution. *Cooper*, 517 U.S. at 367–69.

the procedures for a competency determination. A court "shall proceed under [the provisions of § 971.14] whenever there is reason to doubt a defendant's competency to proceed." Wis. Stat. § 971.14(1). A reason to doubt competency can arise from the defendant's demeanor in the courtroom, colloquies with the court, or by a motion from either party. *State v. Debra A.E.*, 188 Wis. 2d 111, 131, 523 N.W.2d 727 (1994); *see also State v. Johnson*, 133 Wis. 2d 207, 220, 395 N.W.2d 176 (1986) (defense counsel must raise issue of competency when reason to doubt competency arises).

¶ 30. Once such doubt exists, Wis. Stat. § 971.14(2) requires the circuit court to appoint one or more examiners to perform a competency examination. *See State v. McKnight*, 65 Wis. 2d 582, 594, 223 N.W.2d 550 (1974). An examiner reports to the court his or her findings "regarding the defendant's present mental capacity to understand the proceedings and assist in his or her defense." Wis. Stat. § 971.14(3). If the district attorney, the defendant, and defense counsel waive the opportunity to present evidence beyond the examiner's report, the court makes its competency determination. Wis. Stat. § 971.14(4)(b). Absent a waiver, the circuit court conducts a competency hearing. *Id.* The court must find the defendant incompetent unless the State can prove, by the greater weight of the credible evidence, that the defendant is competent. Wis. Stat. § 971.14(4)(b); *Garfoot*, 207 Wis. 2d at 221–22.

¶ 31. Competency to stand trial constitutes a judicial inquiry, not a medical determination. Judicial Council Committee's Note, 1981, § 971.13(1), Stats. "Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capac-

ity to understand the proceedings and to assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993). A court must determine whether the defendant can understand the proceedings and assist counsel "with a reasonable degree of rational understanding." *Debra A.E.*, 188 Wis. 2d at 126. Although a defendant may have a history of psychiatric illness, a medical condition does not necessarily render the defendant incompetent to stand trial. *State ex rel. Haskins v. County Court of Dodge County*, 62 Wis. 2d 250, 264–65, 214 N.W.2d 575 (1974). To determine legal competency, the court considers a defendant's present mental capacity to understand and assist at the time of the proceedings. Wis. Stat. § 971.14(3)(c); *McKnight*, 65 Wis. 2d at 595.

## STANDARD OF REVIEW FOR COMPETENCY HEARINGS

¶ 32. Having addressed the purpose of competency to stand trial, we now turn to the first issue in this case, namely which standard of review an appellate court must employ when reviewing the competency determination of a circuit court. Byrge asks this court to adopt the position of the concurrence in *Garfoot*, 207 Wis. 2d at 229 (Abrahamson, C.J., concurring), arguing that the issue of competency is a question of constitutional fact, or a mixed question of fact and law, subject at least partially to independent review. The State maintains competency determinations should be reviewed as questions of fact under the clearly erroneous standard endorsed by the majority opinion in *Garfoot*, 207 Wis. 2d at 223–24. As a threshold matter, we note that whether an issue presents a question of fact or a question of law is in itself a ques-

216

tion of law. *Crowley v. Knapp*, 94 Wis. 2d 421, 429–30, 288 N.W.2d 815 (1980).

¶ 33. In *Garfoot*, a majority of this court held that competency to stand trial must be reviewed under the deferential clearly erroneous standard. *Garfoot* approached competency determinations as functionally factual inquiries. *Garfoot*, 207 Wis. 2d at 223, 225. Findings of fact are not set aside unless they are clearly erroneous, and appellate courts give due regard to a circuit court's opportunity to assess the credibility of witnesses. Wis. Stat. § 805.17(2). We reasoned that competency determinations merit this level of deference because the circuit court can balance witness credibility and demeanor:

> The trial court is in the best position to decide whether the evidence of competence outweighs the evidence of incompetence. Although the court could make precise findings of fact about the skills and abilities the defendant does and does not possess, the court must ultimately determine whether evidence that the defendant is competent is more convincing than the evidence that he or she is not. The trial court is in the best position to make decisions that require conflicting evidence to be weighed. Although the court must ultimately apply a legal test, its determination is functionally a factual one: either the state has convinced the court that the defendant has the skills and abilities to be considered "competent," or it has not.

> The trial court's superior ability to observe the defendant and the other evidence presented requires deference to the trial court's decision that a defendant is or is not competent to stand trial. Only the trial court can judge the credibility of witnesses who testify at the competency hearing. Thus, only

the trail court can accurately determine whether the state presented evidence that was sufficiently convincing to meet its burden of proving that the defendant is competent to stand trial.

*Garfoot*, 207 Wis. 2d at 222–23.

¶ 34. Chief Justice Shirley S. Abrahamson, joined by Justice Ann Walsh Bradley and Justice Janine P. Geske, concurred in *Garfoot*. Emphasizing the constitutional basis of a competency hearing, the concurrence maintained that a competency determination implicates a question of constitutional fact, a mixed question of fact and law, subject to a two-tier standard of review. *Garfoot*, 207 Wis. 2d at 229, 231–32. (Abrahamson, C.J., concurring). Under this methodology, an appellate court first applies the deferential, clearly erroneous standard in its review of the historical, evidentiary facts. *Id.* at 234. The reviewing court then independently analyzes the application of constitutional principles to the facts. *Id.* at 234–35.

¶ 35. Justice William A. Bablitch concurred separately in *Garfoot*, finding the concurrence authored by Chief Justice Abrahamson "fairly persuasive" but concluding that the court should await a better briefed case in which the standard of review is actually at issue before rejecting the clearly erroneous standard. *Id.* at 238 (Bablitch, J., concurring).

¶ 36. The standard of review is at issue in this case, and both parties have briefed the issue thoroughly. We therefore revisit our holding in *Garfoot*. We begin by considering how the United States Supreme Court treats the standard of review in competency hearings. This court frequently has sought uniformity in the law by following the Supreme Court in constitu-

tional interpretation. *See Isiah B. v. State*, 176 Wis. 2d 639, 646, 500 N.W.2d 637 (1993).

¶ 37. The *Garfoot* concurrence pointed to our independent review of many issues characterized as constitutional facts, including the sufficiency of *Miranda* warnings, voluntariness of confessions, voluntariness of consent to search, and whether the right to silence has been honored. *Garfoot*, 207 Wis. 2d at 235 n.11. In these areas of inquiry, our constitutional decision making has conformed with the interpretations set forth by the Supreme Court. The Court appraises similar questions independently, recognizing the "uniquely legal dimension" of those issues.[8] *Thompson v. Keohane*, 516 U.S. 99, 111–12 (1995).

¶ 38. This court's goal of seeking uniformity leads us to consider the manner in which the Supreme Court classifies appellate review of competency determinations. Although the Court certainly categorizes some issues as constitutional facts, it does not treat all constitutional questions identically. The Court's approach reveals that competency falls within a unique sphere of inquiry, a sphere in which the issue turns on more than historical facts but nonetheless requires

---

[8] The Supreme Court treats the following as constitutional facts, situations in which the Court reviews the application of constitutional principles to the historical facts independently: Voluntariness of a confession, *Miller v. Fenton*, 474 U.S. 104 (1985); probable cause and reasonable suspicion determinations, *Ornelas v. United States*, 517 U.S. 690, 699 (1996); determination whether suspect was "in custody" for *Miranda* purposes, *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); effectiveness of counsel's assistance, *Strickland v. Washington*, 466 U.S. 668 (1984); application of Sixth Amendment right to counsel, *Brewer v. Williams*, 430 U.S. 387, 397 (1977).

appellate courts to grant deference to the findings of a trial court.

¶ 39. The difference between constitutional facts, mixed questions of fact and law, and historical facts, or simply questions of fact, is "often fuzzy at best."[9] *Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159, 176 (1983). The Supreme Court itself acknowledges that it "has not charted an entirely clear course" in the elusive arena of distinguishing between legal and factual questions. *Miller v. Fenton*, 474 U.S. 104, 106 (1985); *see also Cooter & Fell v. Hartmarx Corp.*, 496 U.S. 384, 401 (1990). Whether to label an issue a "question of law," a "question of fact," or a "mixed question of law and fact" often is more a matter of allocation than analysis, an allocation in which the Court recognizes that one judicial actor is better positioned than another to decide a matter. *Miller*, 474 U.S. at 113–14.

¶ 40. Initially, the Supreme Court suggested that reviews of competency determinations comprise mixed questions of fact and law. Under that methodology the Court first examined the trial court's findings of historical facts deferentially but then reviewed independently the ultimate question of competency. Because the determination of competency implicates due process protections, the Court suggested that it was appropriate for it to undertake its own independent review of the application of constitutional principles. *Drope*, 420 U.S. at 175 n.10; *Robinson*, 383 U.S. at 385–86.

¶ 41. The Supreme Court has retooled its approach and now treats competency determinations more like questions of fact. In *Maggio v. Fulford*, 462 U.S. 111 (1983) (per curiam), a majority of the Court

[9] *See generally* George C. Christie, *An Essay on Discretion*, 1986 Duke L.J. 747, 772 (1986).

held that its review of a competency determination must be confined to the clearly erroneous standard.[10] *Fulford* was the result of a habeas corpus proceeding. A Louisiana trial court refused to order examination by a competency commission after assessing the testimony of a psychiatrist who interviewed the defendant for about one hour the day before the hearing. *Id.* at 113. In its review, the United States Court of Appeals for the Fifth Circuit held that the decision of the trial court was not supported by the record. *Id.* The Supreme Court reversed, concluding that the appellate court "erroneously substituted its own judgment as to the credibility of witnesses for that of the Louisiana courts." *Id.* In finding that a trial court is better positioned to reach the ultimate competency determination, the Court reasoned:

> Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth. . .how can we say the judge is wrong? We never saw the witnesses. . . .

*Id.* at 118 (citations omitted).

¶ 42. *Fulford* was the product of a divided Court.[11] Since *Fulford,* however, the Court has not

---

[10] In line with 28 U.S.C. § 2254(d)(8), the Supreme Court used the phrase "not 'fairly supported by the record.' " *Maggio v. Fulford,* 462 U.S. 111, 117 (1983) (per curiam).

[11] Four justices suggested that the majority was overruling those cases in which the Court had held that the review of a competency determination presents a mixed question of fact and law: Justice White concurred in the judgment but disagreed with the majority's conclusion "that competency is a question of

departed from its decision to allocate the ultimate decision of competency to the trial court. Two years after *Fulford*, Justice O'Connor, writing for the majority in *Miller*, concluded that certain trial court findings, including competency to stand trial, should be afforded deference because their resolution hinges on witness credibility, and hence, evaluation of demeanor. 474 U.S. 112–13. Such areas of inquiry offer compelling justifications "for leaving the process of applying law to fact to the trial court." *Id.* at 114. Subsequently, Justice Ginsburg reiterated this view when she authored the majority opinion in *Thompson*. She noted that although certain issues, including competency determinations, embody more than basic, historical facts, they nonetheless fall within a genre of decisions that the court classifies as "factual issues." 516 U.S. at 111.[12]

¶ 43. Many federal courts follow *Fulford*, *Miller*, and *Thompson* in habeas corpus proceedings, treating competency determinations as factual issues left to the

---

historical fact." *Fulford*, 462 U.S. at 119 (1983) (White, J., concurring). Justice Marshall dissented, finding that, "Our decisions clearly establish that whether a competence hearing should have been held is a mixed question of law and fact which is subject to full federal review." *Id.* at 120 (Marshall, J., dissenting). Justice Brennan, with whom Justice Stevens joined, also dissented. He agreed with Justice Marshall's views on the standard of review but disagreed with him about whether the Court should schedule the case for oral argument. *Id.* (Brennan, J., dissenting).

[12] *See also Demosthenes v. Baal*, 495 U.S. 731, 735, 737 (1990) (per curiam) (under *Fulford*, state court's conclusion regarding a defendant's competency is binding on a federal habeas court and noting that court of appeals did not personally observe the defendant and therefore had no reason to overturn what is essentially a factual determination).

discretion of state trial courts.[13] Deference to trial

[13] "After *Miller*, practical considerations govern. A court should determine whether, as a matter of the sound administration of justice, one judicial actor is in a better situation to apply historical facts to a 'pristine' legal standard." *Martin v. Dugger*, 686 F. Supp. 1523, 1556 (S.D. Fla. 1988). *See also United States v. Villegas*, 899 F.2d 1324, 1341 (2d Cir. 1990) (citing *Fulford* for proposition that "[a] defendant's competence to stand trial is a question of fact"); *United States v. Gold*, 790 F.2d 235, 239–40 (2d Cir. 1986); *Smith v. Freeman*, 892 F.2d 331, 341 (3d Cir. 1989) (competence to stand trial is a question of fact); *Fields v. Murray*, 49 F.3d 1024, 1030–31 (4th Cir. 1995) (discussing which questions, after *Fulford* and *Miller*, Supreme Court treats as questions of fact or mixed questions of fact and law, and noting that competency to stand trial is a question of fact); *United States v. Williams*, 819 F.2d 605, 607 (5th Cir. 1987) (after *Fulford*, "the question of the defendant's competency is a question of fact as opposed to a mixed question of law and fact or a question of law"); *Ray v. Duckworth*, 881 F.2d 512, 516 (7th Cir. 1989) ("we must be careful to give due regard to the trial court's superior ability to draw the appropriate inferences from its observation of the defendant and expert witnesses"); *Estock v. Lane*, 842 F.2d 184, 186 (7th Cir. 1988) (reviewing court owes deference to state trial court because of its ability to observe the demeanor of witnesses); *United State ex rel. Mireles v. Greer*, 736 F.2d 1160, 1167 (7th Cir. 1984) (acknowledging that *Fulford* Court reshaped what was "heretofore considered at least a mixed question of law and fact with respect to the issue of competency"); *United States v. Johns*, 728 F.2d 953, 956 (7th Cir. 1984) (overruling previous standard of mixed determination of law and fact and holding that "clearly erroneous" standard applies on appeal to trial court's findings in a competency determination); *Tolbert v. Page*, 182 F.3d 677, 682 n.8 (9th Cir. 1999) (distinguishing which determinations under Supreme Court precedent are reviewed independently and which are treated deferentially); *Evans v. Raines*, 800 F.2d 884, 886 (9th Cir. 1986) (finding that after *Miller*, trial court's com-

courts is not, however, limited to federal habeas corpus reviews of state court decisions. A number of state courts apply the *Fulford* line of cases to appellate

petency determination should be afforded deference even though it might be a mixed question of fact and law); *Oats v. Singletary*, 141 F.3d 1018, 1025 (11th Cir. 1998) (observing that under *Fulford,* a state court's determination of competency to stand trial is a finding of fact reviewed under the clearly erroneous standard); *United States v. Hogan*, 986 F.2d 1364, 1371–72 (11th Cir. 1993) (noting that "as interpreted in *Baal,* the Supreme Court's [*Fulford*] decision stands for the proposition that a state court's conclusion that a defendant is competent to stand trial is a factfinding" and overruling Eleventh Circuit's prior treatment of competency as a mixed question of fact and law).

The Court of Appeals for the Fifth Circuit has not spoken with one voice on the issue. In 1997 the court cited *Fulford* and *Miller* for the proposition that competency is a question of fact. *Carter v. Johnson*, 131 F.3d 452, 460 n.13 (5th Cir. 1997). One year earlier, the court had treated competency as a mixed question of law and fact, in which it suggested that an appellate court should take a "hard look" at the ultimate competency finding. *Washington v. Johnson*, 90 F.3d 945, 951 (5th Cir. 1996). *See also Coe v. Bell*, 89 F. Supp. 2d 922, 926 (M.D. Tenn. 2000) (noting that standard of review in the Sixth Circuit remains a mixed question of fact and law, even though "[s]ince the ruling in [*Fulford*], the Supreme Court. . .confirmed that it has classified as a factual issue the question of competency to stand trial"); *Reynolds v. Norris*, 86 F.3d 796 (8th Cir. 1996) (implementing standard under which appellate court gives deference to state trial court's factual finding of competence, but presumption of correctness does not extend to question whether defendant was denied due process); *Lafferty v. Cook*, 949 F.2d 1546, 1558–59 (10th Cir. 1991) (court reviews application of due process protections independently).

review of competency proceedings.[14] These courts implicitly acknowledge that the *Fulford* methodology is appropriate for competency determinations because of the qualitatively factual nature of the inquiry, not because of the particular posture of a federal habeas corpus proceeding.[15] Like federal courts, these state courts recognize that trial judges are better positioned than appellate judges to observe a defendant's conduct and to gauge the credibility and demeanor of witnesses.[16]

---

[14] *Van Tran v. State*, 6 S.W.3d 257, 271 (Tenn. 1999) (citing *Fulford* for proposition that, "Although likely based upon expert medical and mental health testimony, the ultimate question as to whether the prisoner is competent is a question of fact"); *State v. Cowans*, 717 N.E.2d 298, 313 (Ohio 1999) (*Fulford* illustrates principle that competency is a factual determination best left to the trial judge's observations of the defendant's conduct); *State v. Edwards*, 572 N.W.2d 113, 117 (S.D. 1997) (relying on *Fulford* and finding that "a trial court is better able than we are to judge the demeanor of the accused"). *See also State v. Harris*, 789 P.2d 60, 72 (Wash. 1990) (en banc); *Brooks v. State*, 882 S.W.2d 281, 283 (Mo. Ct. App. 1994); *People v. Morino*, 743 P.2d 49, 52 (Colo. Ct. App. 1987).

[15] In a habeas corpus review, other factors, such as the interests of comity and federalism, also provide reasons for deferring to the factual findings of a state court. *See Estock*, 842 F.2d at 187 n.2. But federalism concerns, *see State v. Garfoot*, 207 Wis. 2d 214, 237 n.14 (1997) (Abrahamson, C.J., concurring), are not what led the Court to review competency determinations under a deferential, "question of fact" standard. In *Fulford* and its successors, the important factor was the ability of the trial court to have face-to-face contact with witnesses. *Fulford*, 462 U.S. at 118.

[16] *See Commonwealth v. Robbins*, 2000 WL 565218 *2–3 (Mass. 2000) ("we must give weight to the judge's opportunity to observe the defendant's demeanor"); *State v. Cowans*, 717 N.E.2d 298, 313 (Ohio 1999) (trial judge's observations of defen-

¶ 44.　Based on our analysis of the case law since *Fulford*, we conclude that the Supreme Court classifies competency to stand trial within a discrete category in which the resolution of the legal issue is better left to the trial court.[17] *Thompson*, 516 U.S. at 111; *Miller*, 474 U.S. at 112–13. Although more than the "what happened" types of historical facts arise in a competency determination, the decision pivots on factors only a trial court can appraise. *Thompson*, 516 U.S. at 111. In a competency proceeding, the ultimate resolution of the legal issue rests on the court's observation of witness credibility and demeanor.[18] "An issue does not

dant's conduct provided support for conclusion that defendant's competence did not warrant further inquiry); *State v. Edwards*, 572 N.W.2d 113, 117–18 (S.D. 1997) (facts and circumstances before the trial court indicated that trial court's decision to deny competency hearing did not violate defendant's due process rights); *State v. Janto*, 986 P.2d 306, 315–16 (Haw. 1999) (overruling mixed question of law and fact standard and adopting "abuse of discretion" standard); *State v. Heger*, 326 N.W.2d 855, 858 (N.D. 1982) ("Whether or not a defendant is competent to stand trial is a question of fact for the trial judge"); *People v. Castro*, 93 Cal. Rptr. 2d 770, 781 (Cal. Ct. App. 2000) (recognizing "general rule on appeal [ ] that a finding of competence to stand trial cannot be disturbed"); *Reed v. State*, 14 S.W.3d 438, 441 (Tex. App. 2000) (issue whether incompetency exists is left to the discretion of trial judge). *See also State v. Zorzy*, 622 A.2d 1217, 1219–20 (N.H. 1993); *People v. Danielson*, 838 P.2d 729, 749 (Cal. 1992); *People v. Morino*, (Colo. Ct. App. 1987).

[17] The Supreme Court has found that the following also constitute questions of fact only: Voluntariness of a guilty plea, *Marshall v. Lonberger*, 459 U.S. 422 (1983), and juror bias, *Wainwright v. Witt*, 469 U.S. 412, 429 (1985), and *Patton v. Yount*, 467 U.S. 1025, 1034–40 (1984).

[18] The circuit judge has a unique vantage from which to make a competency determination because the judge has signif-

lose its factual character merely because its resolution is dispositive of the ultimate constitutional challenge." *Miller*, 474 U.S. at 106. We therefore are persuaded that the circuit court is the judicial actor best positioned to apply a legal standard to the facts of a competency decision.

¶ 45. In the interest of uniformity and consistency in constitutional decision making, we follow the interpretation of the Supreme Court and allocate the application of law to fact to the circuit court in competency proceedings. Because a competency determination depends on the circuit court's ability to appraise witness credibility and demeanor, "there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court." *Id.* at 114. We therefore do not disturb our holding in *Garfoot* and adhere to the clearly erroneous standard for reviewing circuit court determinations in competency proceedings.

---

icant personal exposure to the defendant. The judge is better able to assess a defendant's orientation to time, place, and persons than an appellate court reviewing a paper record. Only the judge can evaluate whether the defendant answers a question quickly or haltingly, thereby showing whether the defendant grasps the inquiry. Only the judge can hear the inflection and volume of the defendant's voice and observe the defendant's posture, attention span, eye contact, and focus on a witness. Only the judge can watch the defendant's reaction, including body language, to events in the courtroom. The judge also can determine whether the defendant is performing for the appellate record.

The judge can note whether the defendant confers with counsel while seated at the defense table. Such communication is a direct reflection of the defendant's ability to understand the proceedings and assist his or her lawyer.

## CIRCUIT COURT'S DETERMINATION OF COMPETENCY

¶ 46. Having examined the threshold issue, standard of review, we now turn to the second issue by examining the circuit court's determination that Byrge was competent to stand trial. Under the standard that applies to competency determinations, we will not reverse the circuit court's decision unless it was clearly erroneous. *Garfoot*, 207 Wis. 2d at 223–24.

¶ 47. The only witness to testify at Byrge's hearing was Dr. Baker, the court-appointed psychiatrist who conducted the competency evaluation of Byrge.[19] Byrge, however, asks this court also to review the reports submitted by Drs. Lorenz and Fosdal. We decline to do so. Both Drs. Lorenz and Fosdal conducted their evaluations for the NGI pleas; they did not examine Byrge for the purposes of a competency determination.[20] An examination for purposes of NGI considers the ability of the "defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct with the requirements of law at the time of the commission of the criminal offense." Wis. Stat. § 971.16(3). An evaluation for competency to stand trial assesses "the defendant's present mental capacity to understand the proceedings and assist in his or her defense." Wis. Stat. § 971.14(3)(c).

---

[19] The court gave Byrge's attorney the opportunity to call other witnesses, but he did not call Drs. Lorenz and Fosdal. Drs. Lorenz, Fosdal, and Baker all were scheduled to testify at the trial. The State entered the two exhibits during the discussion of Byrge's withdrawal of his NGI pleas.

[20] Moreover, the reports by Drs. Lorenz and Fosdal were not entered as exhibits until competency had been determined. Hence, the circuit court apparently did not utilize them in making its determination.

¶ 48. The aims of a competency hearing are modest, seeking to verify that the defendant can satisfy the understand-and-assist test. *See Moran*, 509 U.S. at 402. The hearing need not establish a psychiatric classification of the defendant's condition. *Id.* Section 971.13(1) contemplates a judicial, not a clinical, inquiry,[21] and our courts treat competency to stand trial as a legal standard, not a medical determination. *See Haskins*, 62 Wis. 2d at 265. Elaborate psychiatric evaluations sometimes introduce a clinical diagnosis that may not speak to competency to proceed. *Id.* at 264–65. A history of irrational behavior and prior medical opinions about a defendant's condition, like a defendant's demeanor, can serve as indicia in the competency determination. *Drope*, 420 U.S. at 180. But clinical reports occasionally state that a defendant is incompetent "when what really was meant was merely that the defendant had some mental illness which required treatment." *Haskins*, 62 Wis. 2d at 265.

¶ 49. Even if a defendant has suffered past psychiatric episodes, he or she nonetheless may evince sufficient present ability to proceed. *See Haskins*, 62 Wis. 2d at 263 (quoting *Dusky*, 362 U.S. at 402). Consequently, a court looks at the defendant's "present mental capacity" to understand the proceedings and to assist counsel at the time of the proceedings. Wis. Stat.

_____

[21] "Competency is a judicial rather than a medical determination. Not every mentally disordered defendant is incompetent; the court must consider the degree of impairment in the defendant's capacity to assist counsel and make decisions which counsel cannot make for him or her." Judicial Council Committee Note, 1981, § 971.13(1), Stats.

§ 971.14(3)(c); *McKnight*, 65 Wis. 2d at 595; *see also Garfoot*, 207 Wis. 2d at 222–23.

¶ 50. In this case Byrge essentially asks this court to inject a medical determination into the legal standard. He argues that the circuit court should have found him incompetent to proceed because he suffered from psychological, mental, and psychiatric problems. We decline to do so. Dr. Baker recognized the distinction between the medical classification and legal competency to proceed. He interviewed Byrge twice—once for the NGI evaluation and later for competency to stand trial. He differentiated between the two types of evaluations when he noted that his first examination measured "mental responsibility," whereas the competency evaluation determined if Byrge could cooperate with counsel and assist with his own defense.

¶ 51. Baker concluded that Byrge was able to understand the proceedings and assist in the defense. He found Byrge "was not mentally ill or malingering, he simply was distressed at the number of things that occurred in jail and the possibility of the trial." Baker testified that Byrge was aware of both the charges against him and the many factors involved in the legal process. Although Baker agreed Byrge might be suicidal or depressed, he testified that the condition did not affect legal competency because Byrge was not "unable to cooperate with his attorney or in any way function at the trial."

¶ 52. The circuit court concluded that the State had proven that Byrge was competent because he had "substantial capacity to understand the proceedings and assist in his own defense." The court addressed the credibility and demeanor of the witness and of the defendant. Emphasizing its confidence in Baker's abili-

ties, his testimony in numerous past cases, and his credentials, the circuit court stated that it could listen to Baker's telephone testimony and make a determination without "look[ing] in his eyes." Byrge was present at the hearing, shackled to a wheelchair. The court noted the constraints on Byrge's physical liberty and did not discount them in its competency determination. The record makes no indication that Byrge was agitated or disruptive during the proceeding.

¶ 53. The findings of the circuit court are supported by the testimony of Dr. Baker and the circuit court's observation of Byrge's demeanor. Based on the record before us, we find that the trial court did not erroneously exercise its discretion when it found Byrge competent to stand trial. We therefore decline to second-guess the factual determination of the circuit court.

## PAROLE ELIGIBILITY INFORMATION

¶ 54. Having affirmed the circuit court's determination that Byrge was competent to stand trial, we next address the third issue, namely whether a circuit court, before accepting a plea of guilty or no contest, must inform a defendant that it possesses the authority to fix the parole eligibility date. Byrge contends that his pleas were not knowingly and intelligently entered because the circuit court did not warn him that the maximum penalty was not merely a life sentence, but a life sentence without the possibility of parole.

¶ 55. We begin by noting that the standard of review for this issue differs from the standard that we have applied thus far in this case. Whether a plea was entered knowingly, voluntarily, and intelligently presents a question of constitutional fact. *State v.*

*Bangert*, 131 Wis. 2d 246, 283, 389 N.W.2d 12 (1986) (citing *Miller*, 474 U.S. 104). We will not disturb a circuit court's findings of historical, evidentiary facts unless they are clearly erroneous. *State v. Bollig*, 2000 WI 6, ¶ 13, 232 Wis. 2d 561, 605 N.W.2d 199. However, we review the application of the law to the historical facts independently. *Id.* Under this standard, an appellate court may look to the entire record in the course of its review. *Bangert*, 131 Wis. 2d at 283.

¶ 56. When a circuit court sentences a defendant to life imprisonment, it must make a parole eligibility determination. As it applied to Byrge, Wis. Stat. § 973.014 required the sentencing court to exercise one of two options by: 1) determining that the defendant is eligible for parole under Wis. Stat. § 304.06, or 2) setting a parole eligibility date. Wis. Stat. § 973.014(1)–(2).[22] In this case the circuit court exercised the second alternative under Wis. Stat. § 973.014(2) and set Byrge's parole eligibility date at July 2, 2095. The court noted that on that date, Byrge would be 120 years old.[23] Although the circuit court

----

[22] The current version of Wis. Stat. § 973.014 provides the court with a third option, namely to determine that the person is not eligible for parole. Although the statute has been amended, the change does not affect our analysis.

[23] Judge Deets remarked:

> I am aware that some people live to be 110, and maybe with the advances of medical science, that you might have the capability of living to 110. I have my doubts. But to be on the safe side, and for the reasons that this court has stated, I believe that the parole eligibility date should be set for July 2, 2095, when you would be 120 years old.

A court may impose a parole eligibility date beyond the expected lifetime of a defendant. *State v. Setagord*, 211 Wis. 2d 397, 414, 565 N.W.2d 506 (1997).

engaged in an extensive colloquy with Byrge at the plea hearing, it did not inform Byrge about its options regarding the setting of parole eligibility or its authority to fix a parole eligibility date.

■■■■

¶ 57. It is well established that a criminal defendant must enter a plea of guilty or no contest knowingly, voluntarily, and intelligently. *Bollig*, 2000 WI 6, ¶ 15. When a defendant is not aware of the potential punishment, the plea is not entered knowingly, voluntarily, and intelligently, and the result is a manifest injustice. *State ex rel. Warren v. Schwarz*, 219 Wis. 2d 615, 635–36, 579 N.W.2d 698 (1998).

¶ 58. Wisconsin Stat. § 971.08 governs the plea colloquy procedure a circuit court must follow to ensure that a plea is knowing, voluntary, and intelligent. The circuit court must "[a]ddress the defendant personally and determine that the plea is made voluntarily with understanding of the nature of the charge and the potential punishment if convicted." Wis. Stat. § 971.08(1)(a).

■■■■

¶ 59. The issue here effectively requires us to decide whether parole eligibility directly reflects a potential punishment under Wis. Stat. § 971.08(1)(a). If it does, then the circuit court should have addressed parole eligibility in its plea colloquy with Byrge. When a defendant makes a prima facie showing that the circuit court did not conform with the statutory procedures of § 971.08, and the defendant alleges that he or she did not know or understand the information that the court should have provided at the plea hearing, the burden shifts to the State to prove by clear and convincing evidence that the defendant nonetheless

entered the plea knowingly, voluntarily, and intelligently. *See Bangert*, 131 Wis. 2d at 274.

¶ 60. Defendants have a due process right to be notified about the "direct consequences" of their pleas. *See Bollig*, 2000 WI 6, ¶ 16. A direct consequence of a plea is one that has a definite, immediate, and largely automatic effect on the range of a defendant's punishment. *Id.* If a defendant is not aware of the direct consequences of a plea, he or she is not appraised of "the potential punishment" under Wis. Stat. § 971.08(1)(a).

¶ 61. Information about "collateral consequences" of a plea, by contrast, is not a prerequisite to entering a knowing and intelligent plea. *Warren*, 219 Wis. 2d at 636. Collateral consequences are indirect and do not flow from the conviction. For example, collateral consequences may be contingent on a future proceeding in which a defendant's subsequent behavior affects the determination. *Warren*, 219 Wis. 2d at 637–38 (citing *State v. James*, 176 Wis. 2d 230, 243–44, 500 N.W.2d 345 (Ct. App. 1993)). Sometimes a collateral consequence is one that rests not with the sentencing court, but instead with a different tribunal or government agency. *State v. Kosina*, 226 Wis. 2d 482, 486, 595 N.W.2d 464 (Ct. App. 1999) (citing *Torrey v. Estelle*, 842 F.2d 234, 236 (8th Cir. 1988)). The distinction between direct and collateral consequences essentially recognizes that it would be unreasonable and impractical to require a circuit court to be cognizant of every conceivable consequence before the court accepts a plea. *Warren*, 219 Wis. 2d at 638–39.

¶ 62. Byrge contends that his pleas were not knowing or intelligent because the information about

the parole eligibility date affected the range of his punishment and therefore constituted a direct consequence of his pleas. The State maintains that the circuit court's power to set the parole eligibility date represents only a collateral consequence of the plea, and therefore Wis. Stat. § 971.08(1)(a) did not obligate the circuit court to notify Byrge.

¶ 63. In its review of this case, the court of appeals held that the circuit court's failure to inform Byrge about parole eligibility did not render the plea defective. *Byrge*, 225 Wis. 2d at 718. The court relied in part on *Birts v. State*, 68 Wis. 2d 389, 398–99, 228 N.W.2d 351 (1975), in which we held that a circuit court is not required to notify defendants about parole rights. *Byrge*, 225 Wis. 2d at 716. The court also turned to a decision by the Supreme Court, *Hill v. Lockhart*, 474 U.S. 52, 56 (1985), which concluded that a defendant is not constitutionally entitled to be forewarned about parole eligibility. *Byrge*, 225 Wis. 2d at 715–16. The court of appeals noted that both *Birts* and *Hill* were decided at a time when the parole decision was left to the parole board, before Wis. Stat. § 973.014(2) authorized the sentencing court to engage in the threshold parole decision.[24] *Id.* at 716. Nonetheless, the court reasoned that the holdings of those cases were still efficacious because Wis. Stat. § 973.014 does not *mandate* the sentencing court to fix a parole eligibility date but rather allows the court to leave the decision to set the eligibility to the parole board. *Id.* at 716–17.

¶ 64. The court of appeals also dismissed Byrge's reliance on *State v. Bentley*, 195 Wis. 2d 580, 536 N.W.2d 202 (Ct. App. 1995), *rev'd on other grounds*, 201

---

[24] Wisconsin Stat. § 973.014 became effective on July 1, 1988, and applies to crimes committed on or after that date.

Wis. 2d 303, 548 N.W.2d 50 (1996). In that case, the court of appeals suggested that parole eligibility constitutes a direct, not a collateral, consequence of the sentence. *Byrge*, 225 Wis. 2d at 717 (citing *Bentley*, 195 Wis. 2d at 590). While noting that this court reversed *Bentley* only on other grounds, the court concluded that *Bentley* does not govern here because it was decided in the context of an ineffective assistance of counsel claim.

¶ 65. We agree with the court of appeals that its decision in *Bentley* is not germane to this case. The core of the parole eligibility discussion in *Bentley* centered on "misadvice" in the ineffective assistance context, namely, the defense counsel's failure to advise a client about parole eligibility. *Bentley*, 195 Wis. 2d at 589–90. *Bentley* did not address whether Wis. Stat. § 971.08(1)(a) obligates a sentencing court to inform defendants about parole eligibility as a direct consequence of the plea. Moreover, we reversed *Bentley* on other grounds, and, because we do not address an ineffective assistance of counsel claim in this case, we decline to reassess *Bentley* here.

¶ 66. Like the court of appeals, we also find it significant that *Birts* and *Hill* were decided before Wis. Stat. § 973.014 authorized the sentencing court to take part in the threshold parole decision. *See Byrge*, 225 Wis. 2d at 716. Although § 973.014 does not "mandate" the sentencing court to fix the parole eligibility date, § 973.014(2) grants the court that authority. If the circuit court declines to exercise the option and allows the parole board to set the date, the parole right becomes contingent on a future proceeding, subject to a determination by a different government agency. The decision of the parole board then may turn on the defendant's future behavior, a factor that would be impractical for

the circuit court to divine. *See Warren*, 219 Wis. 2d at 638–39. When a parole board makes an eligibility determination at a date after the sentencing order, parole eligibility is not an immediate and largely automatic result of the conviction. Hence, if the circuit court leaves the decision to another agency, the parole eligibility information is a collateral consequence of the plea, and failure to notify the defendant about parole eligibility does not compromise the plea.

¶ 67. We find, however, that a different set of considerations arises in the limited circumstances in which a sentencing court itself sets the parole eligibility date. If a circuit court elects to exercise the statutory option set forth in Wis. Stat. § 973.014(2), as it did in this case, the parole eligibility date links automatically to the period of incarceration, which in turn has a direct and automatic effect on the range of punishment. At Byrge's plea hearing, the circuit court expressly acknowledged this reality when it selected a parole eligibility date that exceeded Byrge's anticipated life span.

¶ 68. We therefore hold that in the narrow circumstance in which a circuit court has statutory authority under Wis. Stat. § 973.014(2) to fix the parole eligibility date, the circuit court is obligated to provide the defendant with parole eligibility information before accepting a plea. Parole eligibility in this discrete situation implicates punishment and constitutes a direct consequence of the plea. Because the circuit court did not inform Byrge about a potential direct consequence of his conviction, we conclude that Byrge has made a prima facie showing that the plea was not knowing, voluntary, and intelligent according to the requirements outlined in Wis. Stat. § 971.08(1)(a).

¶ 69. Having found that Byrge has made a threshold showing that the plea colloquy was defective, we now examine whether the State nonetheless has proven by clear and convincing evidence that Byrge nonetheless entered the plea knowingly, voluntarily, and intelligently. *See Bangert*, 131 Wis. 2d at 274. If we find that the State has met this burden by showing that Byrge was aware of the parole eligibility possibilities, we will not disturb the pleas Byrge entered. *See id.* at 274–75.

¶ 70. In making its showing, the State may rely on any evidence, including testimony from defense counsel, to prove that a defendant possessed the requisite information to make the plea knowing, voluntary, and intelligent. *Id.* In this case the State offers the testimony that Byrge's trial counsel, Norby, provided at a post-conviction motion hearing. Although we recognize that Norby made his observations in the context of defending himself in an ineffective assistance of counsel claim, we nonetheless find his testimony pertinent to the State's burden. When reviewing a plea, we do "not focus on 'ritualistic litany' of formal elements" but instead consider whether the defendant received real notice about the implications of the plea. *Bangert*, 131 Wis. 2d at 282–83 (internal quotations omitted).

¶ 71. Norby testified that Byrge appeared to understand what his options were before the plea was entered, and he explained to Byrge that a conviction for first-degree intentional homicide carried a mandatory life sentence. Norby said that Byrge understood that the court could set a parole eligibility date sufficiently far enough into the future that Byrge would have no realistic opportunity of being released during his lifetime. According to Norby, Byrge never expressed any

confusion or lack of knowledge about the plea or the likely penalties.

¶ 72. Byrge told the court at his change of plea hearing that he understood that the charge of first-degree intentional homicide carries a punishment of life imprisonment. He also testified at the post-conviction motion hearing. When asked if Norby discussed a parole eligibility date with him, Byrge said, "He never talked to me about going to prison at all for that." Byrge, however, added that he knew what parole eligibility meant. He also recognized that by entering the plea, the court would find him guilty of first-degree intentional homicide. Moreover, Byrge stated that he understood that the penalty for the crime was a mandatory sentence of life in prison.

¶ 73. The circuit court issued a written decision denying Byrge's motion for post-conviction relief. The court made the following finding:

> [T]he Defendant was advised that he faced life imprisonment as punishment for his crime and the Defendant testified that he understood. Trial counsel discussed with the Defendant that the court could set parole eligibility so far into the future that he would not be released during his lifetime and that the Defendant understood that possibility. Under these circumstances, this court finds that the Defendant was advised of the maximum penalty and that he faced life without the possibility of parole.

We do not disturb this finding of fact because we conclude that the circuit court's determination was not clearly erroneous. The testimony of Norby supported the court's decision that Byrge knew and understood the parole eligibility possibilities at the time he entered his plea. We therefore conclude that the State has met

its burden to prove that Byrge had real notice about the implications of the plea.

¶ 74. We hold that although the circuit court had a duty to inform Byrge about the parole eligibility information before it accepted his plea, the State has met its burden to prove that, despite the deficiency of the plea colloquy, Byrge nonetheless entered the plea knowingly, voluntarily, and intelligently.

## CONCLUSION

¶ 75. We hold that an appellate court reviewing a competency determination must utilize the clearly erroneous standard. Like the Supreme Court, we recognize that a competency hearing presents a unique category of inquiry in which the circuit court is in the best position to appraise witness credibility and demeanor and therefore to apply the law to the facts. Under this deferential standard of review, we affirm the circuit court's determination that Byrge was competent to stand trial. The testimony at the competency hearing supported the finding that Byrge was able to understand the proceedings and assist in his defense. We also conclude that when a circuit court exercises its statutory option to fix a parole eligibility date, the date impacts the potential punishment. In this limited circumstance the parole eligibility information is a direct consequence of the plea. In this case, however, the State has met its burden to prove that, despite the deficiency of the plea colloquy, Byrge nonetheless entered the plea knowingly, voluntarily, and intelligently.

*By the Court.*—The decision of the court of appeals is affirmed.

240

¶ 76. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring)*. We granted review in this case to reconsider the standard of review of a circuit court's determination of competency announced in *State v. Garfoot*, 207 Wis. 2d 214, 558 N.W.2d 626 (1997).[1] On reconsideration I conclude, as I did in my concurrence in *Garfoot*, that "a determination of competency, a determination of constitutional fact, should be decided by this court independently of the decisions of a circuit court or court of appeals, yet benefiting from the analyses of those courts and the observational advantage of the circuit court." *Garfoot*, 207 Wis. 2d at 231–32. The reasons for my conclusion are set forth in my *Garfoot* concurrence.

¶ 77. An issue raised in the petition and briefs in the present case, but not reached by the court, is whether the court of appeals is bound by the rules announced in its own published decision when this court has reversed the published decision on unrelated, independent grounds. Also unclear is the lasting effect, if any, of all or part of a court of appeals decision that has been reviewed by this court and affirmed. A decision by this court on these issues will have to await another case or a rule-making procedure.

¶ 78. For the reasons set forth I join the mandate but write separately.

¶ 79. ANN WALSH BRADLEY, J. *(concurring)*. I agree with the standard of review set forth in the concurring opinion of Chief Justice Abrahamson. I write separately, however, to express my concern with that

---

[1] For the reasons that the *Garfoot* majority opinion was viewed as being in jeopardy, *see State v. Byrge*, 225 Wis. 2d 702, 711 n.2, 594 N.W.2d 388 (Ct. App. 1999).

part of the majority opinion addressing parole eligibility information as a direct consequence of a plea.

¶ 80. The majority attempts to rein in the reach of its holding and asserts that parole eligibility information is a direct consequence only in the "limited circumstance" in which the circuit court has the statutory authority to fix the parole eligibility date under Wis. Stat. § 973.014(2). Majority op. at ¶ 67. Despite the majority's effort to narrow the reach, it nevertheless fails to address the broad implications of its holding.

¶ 81. I understand why the majority does not address the issue of retroactivity. It was neither briefed nor argued by the parties. Nevertheless, retroactive application is a critical concern because circuit courts now may face a number of collateral challenges asserting the failure to inform defendants of their parole eligibility. Implications for Truth in Sentencing purposes also may arise. The majority establishes a new legal principle yet provides little guidance to courts in addressing the ramifications of this newly articulated mandate. Accordingly, I concur.