State of Wisconsin, Plaintiff-Respondent,
v.
Katrina French, Defendant-Appellant.
No. 03-0478-CR.
Court of Appeals of Wisconsin.
Opinion Filed: November 30, 2004.
Before Fine, Curley and Kessler, JJ.
¶1 PER CURIAM.
Katrina French appeals from a judgment convicting her of one count of neglecting a child, causing death, in violation of WIS. STAT. § 948.21(1) (2001-02).[1] French contends that the trial court erred in finding her competent and in denying her motions seeking to suppress statements she made to the police. Because the trial court's finding of competency was not clearly erroneous and because we need not address French's challenge to the trial court's denial of her suppression motion by virtue of the ultimate charge to which she pled guilty, we affirm.

I. BACKGROUND.
¶2 On the morning of August 7, 2000, the body of a three-month-old infant was found in a dumpster near North 14th Street. The infant was wearing a white t-shirt and was naked from the waist down. A small sock was placed in the infant's mouth, and rolled up leaves had been stuffed in each of his nostrils. The medical examiner determined that the infant died of asphyxiation, and that he also had suffered a skull fracture.
¶3 The infant had been left in the care of French, a mentally disabled individual, and her sister on the evening of August 6, at approximately 10:45 p.m. The mother, French's downstairs neighbor, returned for the child at approximately 3:30 a.m., but was unable to locate him. After several hours, she called the police, and the infant's body was found in the dumpster later in the morning of August 7.
¶4 That evening, the police asked French if she would voluntarily go to the police station for questioning, and she agreed. After being interviewed, and agreeing to stay to speak with additional detectives, the police discovered that French had an outstanding municipal warrant and arrested her in the early morning hours of August 8. After she was arrested, she was advised of her Miranda rights[2] and agreed to speak without an attorney present. The police commenced an interview that lasted approximately four and one-half hours. The police continued to interview French over the course of the next several days. Throughout the course of the interviews, French gave inconsistent statements to the police, denying her involvement in the infant's death, and implicating others.
¶5 On the morning of August 9, French gave an inculpatory statement to the police, admitting her involvement in the infant's death, and indicating that she acted alone. She told the police that at around 11:35 p.m. on August 6, she went downstairs, picked up the infant, and attempted to get him to stop crying. When her efforts to quiet the baby proved to be unsuccessful, she took the sock off of his foot and placed it in his mouth. She told the police that she took the sock out of his mouth three times, but he would not stop crying. Eventually, the infant stopped crying, and when she checked on him, she realized that he was not breathing. French told the police that she panicked, and carried the infant out through the back door wrapped in a white blanket, with the sock still in his mouth. She walked down the alley for a couple of blocks, and decided to "hide" him in a garbage can. When she opened the garbage can, she saw water in the bottom of the can, so she found some leaves, rolled them up, and placed them in each of his nostrils, because she did not want the water to go up his nose. She told the police that she put the infant in the garbage can, still wrapped in the blanket, and that she believed he was still wearing a diaper when she did so. At that time, she ran back to the house.
¶6 Later on August 9, after a court commissioner found probable cause, French was interviewed yet again, and gave another inculpatory statement to the police. This time, however, French told the police that the infant was covered by a towel, not a blanket, when she picked him up, and that she noticed that his diaper was wet. She said that she attempted to change him into one of her daughter's diapers, but it was too big, so she removed the diaper completely. She told the police that she gave the infant a pacifier, tried to feed him, and walked around with him, but he would not stop crying. She carried him outside into the backyard, and because he would not stop crying, removed one of his socks and placed it in his mouth. She said that she took the sock out of his mouth, but put it back because he would not stop crying. After she did this two or three times, she realized that he was not breathing. French told police that she panicked, and began walking away from the house. She ran into a friend of her brother, whom she referred to as "Junior," and after he inquired as to what was wrong, she told him that she killed the baby by accident and did not know what to do. She said that she asked him to open the garbage "cart" and noticed that there was water in the bottom. She placed the leaves in the infant's nostrils, again asked the friend to open the garbage "cart," and dropped the infant inside.
¶7 The police arrested "Junior" after French identified him in a photo. He was subsequently released, however, when the police verified his alibi. Shortly thereafter, after summoning detectives, French gave yet another statement on August 10 indicating that she did not know who helped her dispose of the body.
¶8 A complaint was filed on August 12, charging French with one count of first-degree reckless homicide, in violation of WIS. STAT. § 940.02(1). At a pretrial conference on January 11, 2001, defense counsel raised concerns about French's competency to proceed. Pursuant to WIS. STAT. § 971.14, the trial court ordered that French be examined by a doctor from the Forensic Unit of the Milwaukee County Mental Health Division. That doctor concluded that French was not competent to proceed. Thereafter, French was examined three more times, and all three doctors concluded that she was competent to proceed.
¶9 In March 2001, the trial court held an evidentiary hearing on the issue of French's competency and her motion to suppress the statements she made to the police. Over the course of the hearing, which stretched over nearly a month, several doctors and police officers testified as to French's competency, the circumstances surrounding the Miranda warnings, and her understanding of those rights. After weighing the evidence, the trial court first concluded that French was competent to stand trial, and later denied the motion to suppress.
¶10 In October 2001, defense counsel re-raised the issue of French's competency to proceed. The trial court ordered that she be re-examined, and the doctor who examined her concluded that she was competent. In December, the trail court held another evidentiary hearing, and in January 2002, again found her to be competent.
¶11 On January 15, 2002, French pled guilty to a lesser charge of one count of neglecting a child, causing death, in violation of WIS. STAT. § 948.21(1). The factual basis for the plea was set forth as follows:
On about August 6, year 2000, ... the mother of [the victim] ... arranged with Katrina French to have ... French babysit [the infant]. French agreed to babysit.... [The mother] brought [the infant] to the duplex apartment building where ... Katrina French lived in the upper apartment. French knew that [the infant] was left in the downstairs apartment and that [the mother] was leaving at the time.
French did not go to the ... downstairs apartment to retrieve [the infant] who was, therefore, left unsupervised. As a consequence of French's intentional failure to act and take custody of [the infant], which contributed to his neglect, [the infant's] death by asphyxiation subsequently resulted. ...
All of this occurred on or about August 6, 2000, at or in the vicinity of the 1800 block of North 12th Street, in the City and County of Milwaukee, State of Wisconsin. French was subsequently sentenced to ten years, consisting of four years of initial confinement and six years of extended supervision. The trial court stayed the sentence, however, and placed her on probation, with conditions, for seven years. She now appeals.

II. ANALYSIS.
¶12 French contends that the trial court erred in finding her competent to stand trial. She argues that she is incompetent because she lacked substantial mental capacity to understand the proceedings and to assist in her own defense. French insists that although mental retardation, in and of itself, is generally not sufficient to give rise to a finding of incompetence, a defendant may be incompetent based on mental retardation alone if the condition is so severe as to render her incapable of functioning in critical areas, and each doctor who testified acknowledged her inability to function in critical areas. She also contends that only one doctor "clearly and heads on addressed" her decision-making capacity and found her incompetent to make a number of decisions that she faced. French contends that, in assessing her competency, the trial court took into account only "the most rudimentary of matters." She argues that the doctors who found her competent did so without foundation, and all acknowledged her significant deficits. She insists that under cases such as State v. Garfoot, 207 Wis. 2d 214, 558 N.W.2d 626 (1997), competency "means much more than just knowing the roles of the judge, DA, defense attorney, and jury[,]" and although the trial court mentioned these cases, it failed to apply their principles.
¶13 "Whenever there is a reason to doubt the competency of a defendant to proceed, the trial court must order an examination of the defendant under WIS. STAT. § 971.14(1)(a) and (2)." Garfoot, 207 Wis. 2d at 221. Under WIS. STAT. § 971.14(3), the examiner must submit a report including, inter alia, his or her opinion "regarding the defendant's present mental capacity to understand the proceedings and assist in his or her defense." § 971.14(3)(c). If the defendant's competency is contested, as it was here, the trial court is to hold an evidentiary hearing. § 971.14(4)(b). The burden is on the State to prove by the greater weight of the credible evidence that the defendant is competent to proceed, if the defendant asserts that he or she is incompetent. Garfoot, 207 Wis. 2d at 221-22.
¶14 The supreme court has set forth the basic test for determining competency as follows:
A person is competent to proceed if: 1) he or she possesses sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding, and 2) he or she possesses a rational as well as factual understanding of a proceeding against him or her. Dusky [v. United States], 362 U.S. [402, 402 (1960) (per curiam)]. The [Supreme] Court later expanded on this test, noting that "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." Drope v. Missouri, 420 U.S. 162, 171 (1975).
Wisconsin Statutes § 971.13(1) is the codification of the Dusky test. In Wisconsin, if a defendant claims to be incompetent, the court shall find him incompetent to proceed unless the [S]tate can prove by the greater weight of the credible evidence that the defendant is competent under the two-part Dusky standard as explained by the [C]ourt in Drope.

Garfoot, 207 Wis. 2d at 222. "This two-part `understand-and-assist' test constitutes the core of the competency-to-stand-trial analysis." State v. Byrge, 2000 WI 101, ¶28, 237 Wis. 2d 197, 614 N.W.2d 477.
¶15 "Competency to stand trial constitutes a judicial inquiry, not a medical determination." Id., ¶31. To determine whether the State met its burden, the trial court must weigh all of the evidence presented, and is "in the best position to decide whether the evidence of competence outweighs the evidence of incompetence[,] ... [and] to make decisions that require conflicting evidence to be weighed." Garfoot, 207 Wis. 2d at 222-23. Indeed, "[a]lthough the court must ultimately apply a legal test, its determination is functionally a factual one: either the [S]tate has convinced the court that the defendant has the skills and abilities to be considered `competent,' or it has not." Id. at 223. Finally, "[b]ecause a competency determination depends on the [trial] court's ability to appraise witness credibility and demeanor, `there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court.'" Byrge, 237 Wis. 2d 197, ¶45 (citation omitted). As such, we will not reverse a trial court's determination of competency unless it was clearly erroneous. Id., ¶¶45-46.
¶16 Here, the trial court heard testimony from several doctors, and from French herself, over the course of two different hearings. The trial court also considered the reports filed by the doctors, and observed French's behavior and interactions with her attorney during the course of the proceedings. All but one of the doctors found French to be competent. In determining that French was competent to proceed, the trial court indicated that it found a lot of consistency within the reports that were filed. The trial court noted that the reports indicated that she was attentive and alert, responsive to questioning, capable of maintaining a social relationship for a period of time, able to make and receive calls on a cellular phone, and mindful of the roles of the attorneys, the court, and the jury. It also indicated that she adapted to the rules of the ward while she was being observed in the inpatient setting.
¶17 The trial court addressed her intellectual functioning, indicating that she can think in terms of good and bad, and understands what it means to tell a lie or the truth. It noted that French did appear to be mildly retarded, but that it also must consider her background and life experiences. The trial court also noted that one doctor did conclude that French was incompetent and unlikely to regain competency within the statutory period. It concluded, however:
So when the Court takes the entire record and all those individuals who testified, whether or not the defendant has sufficient present ability to consult with her lawyer and with a reasonable degree of rational understanding and whether or not she has a rational as well as a factual understanding of the proceedings against her, using those standards as stated on the record and contained in the cases that were cited ... the Court believes that the State has proven by a greater weight of the credible evidence that the defendant is certainly competent to proceed and the State has met its burden of proof. ... A lot of that certainly was based upon the testimony and, also, the Court's observations of the witnesses who testified and the Court's observations during the entire trial of the defendant, and the totality of the evidence.
¶18 French argues that the trial court failed to apply the proper principles in making its determination of competency, but, as noted above, the trial court weighed all of the evidence and concluded that she was able to both understand the proceedings against her and to assist in her defense. That is the standard set forth in Byrge and Garfoot. While the trial court did recognize that French suffers from some mental deficiencies, it concluded that the evidence of her competency outweighed that of her incompetency. Other than referring to the opinion of one doctor, who concluded that French was incompetent, French has not pointed to anything that renders the trial court's conclusion clearly erroneous.
¶19 While one doctor did determine that French was incompetent, and several of the doctors concluded that she is unable to think abstractly and needs to have things explained in a simple or incremental fashion, there was also evidence presented that French is able to care for her five children, albeit with some help; go grocery shopping; understand the difference between guilt and innocence; rationally communicate with her attorney; explain her whereabouts on the day of the incident; and understand the charges against her, the possible consequences if found guilty, and the facts and circumstances surrounding the charges. Thus, although there was conflicting evidence concerning her competence, it is the job of the trial court to determine whether the evidence of the defendant's competency outweighed that of her incompetency. While French is not satisfied with the outcome of the trial court's decision, there was sufficient evidence presented upon which the trial court could base its determination of competency, and we have found nothing in the record compelling us to conclude that that determination was clearly erroneous.
¶20 Next, we address French's contention that the trial court erred in denying her motion to suppress statements she made to the police, and conclude that under State v. Pozo, 198 Wis. 2d 705, 544 N.W.2d 228 (Ct. App. 1995), it is unnecessary to consider the merits of this argument. In that case, Pozo sought to suppress a statement he made to the police, prior to being advised of his Miranda rights, that was relevant to a charge that was dismissed after the preliminary hearing and of which he was not eventually convicted as a result of his guilty plea. Pozo, 198 Wis. 2d at 713-14. We noted that a voluntary guilty plea waives all nonjurisdictional defects, and although WIS. STAT. § 971.31(10) provides a narrow exception to that ruleallowing the review of a motion challenging the admissibility of a statement on appeal notwithstanding the fact that the judgment was entered as a result of a guilty pleathat exception was inapplicable to Pozo's case "because the statement sought to be suppressed ha[d] no possible relevance to the charge of which Pozo was convicted." Pozo, 198 Wis. 2d at 714-16. We reasoned:
[T]he trial court's denial of Pozo's motion to suppress the statement could play no role in determining the result of a trial on the charge [that he plead guilty to] (had he not pled guilty to that offense). And we agree ... that ... in framing the narrow exception to the guilty-plea waiver rule found in § 971.31(10) ... the legislature could not have intended to allow a defendant who pleads guilty to one charge to raise on appeal a claim regarding the suppression of evidence relevant only to another separate charge of which he was not convicted.
Pozo, 198 Wis. 2d at 715. While the circumstances are a bit different here, the essential reasoning still holds.
¶21 Here, the statements French sought to suppressthe statements she gave to the police in which she confessed to killing the infantwere relevant to, and presumably the basis for, the original charge of first-degree reckless homicide. However, French eventually pled guilty to, and was convicted of, one count of neglecting a child, causing death. As indicated above, the factual basis set forth for the plea did not reference or include any of the confessions or statements French made to the police. The factual basis for the plea described a situation in which the infant was left in the care of French, the infant was left unsupervised, and "[a]s a consequence of French's intentional failure to act and take custody of [the infant], which contributed to his neglect, [the infant's] death by asphyxiation subsequently resulted." Thus, the statements French sought to suppress are not directly relevant to the charge of which she was convicted, and as such, we need not determine whether the trial court erred in denying their suppression. Accordingly, we affirm.
By the Court.  Judgment affirmed.
NOTES
[1] All references to the Wisconsin Statutes are to the 2001-02 version unless otherwise noted.
[2] Miranda v. Arizona, 384 U.S. 436 (1966).