STATE of Wisconsin, Plaintiff-Respondent,†

v.

Jimmie Lee SMITH, Defendant-Appellant.

Court of Appeals

*No. 2013AP1228–CR. Submitted on briefs April 1, 2014.
—Decided September 16, 2014.*

2014 WI App 98

(Also reported in 855 N.W.2d 422.)

† Petition for Review filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *John T. Wasielewski* of *Wasielewski & Erickson* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *Christine A. Remington*, assistant attorney general.

Before Fine, Kessler and Brennan, JJ.

¶ 1. KESSLER, J. Jimmie Lee Smith appeals the judgment of conviction, following a jury trial, of one count of second-degree sexual assault. Smith also appeals the order denying his postconviction motion for relief. Specifically, Smith contends that the postconviction court erred when, at the conclusion of a postconviction competency hearing, it found that Smith was competent at the time of trial and sentencing. We conclude that the record, including the postconviction testimony of two mental health experts that Smith was incompetent at trial and sentencing, establishes a reason to doubt his competence at trial and sentencing. Consequently, we vacate the conviction and remand for a new trial.

## BACKGROUND

¶ 2. In October 2009, a jury found Smith guilty of one count of second-degree sexual assault. In December 2009, Smith was sentenced to forty years' imprisonment, consisting of twenty-five years of initial confinement and fifteen years of extended supervision.[1] At the sentencing hearing, Smith made a rambling statement to the sentencing court, which the court found irrelevant and nearly impossible to follow. Smith's statement, which we can only best describe as bizarre, bordering on incoherent, was as follows:

> Today I want to say in court that I have been through a lot in my life. I help peoples and I got - - I got this. I bail peoples out of jail, I got this. I let peoples stay in my house, I got this. I let peoples eat at my house, I got this.

---

[1] The Honorable Jeffrey A. Conen presided over the jury trial and sentencing.

Today [the victim], I don't know what she lookin' for out of me and why is she comin' to court like this? What it is that she want from me? She in love with me or something? Sayin' that she haven't took a shower since this happened to her? What is wrong with her? I let bygones be bygones. Peoples done throw salt on me every day, every day out there on the street. Peoples took money from me at the court sale, at the court-house. But I let it ride, they wouldn't even give it back. I let it go.

I sit up North, did time behind bailin' this girl, [Y.C.], out of jail in Chicago, Illinois for child neglect, because I went to court the day that she was - - she was in court, and I went and bailed her out of jail. And then I hear all of this about me? And she supposed to have been back in court. She never go back. She never go back for her - - for - - to get her bail back. But I'm the one who had to sign her bail as being right to this day.

I am very, very sorry that I even helped this lady. But these ladies are sayin' things like this about me. And she ain't white like her, the lady that - - that I bailed out of jail, she's black. And her daughter, I looked out for them when they was starvin' to death, livin' out on the street corner. I'm out here tryin' to make a living every day at my job workin', lost my job behind all of that, feedin' them, lettin' them stay in the house, ended up getting' in trouble with my landlord by buyin' air-conditionin' and things without asking his permis-sion, could I have it in my apartment with the rent and - - and included with the lights.

And this is the thanks I get out of it? 12 years like I murdered someone out there on the street? I sat in there 12 years for bailin' her out of jail. I didn't see all these troubles until I bailed her out of jail. Helped her and her family.

And then my brothers, them too, I even brought them to my house and helped them. When I lived with

586

them, they couldn't even pay the light bill. Wouldn't even pay the light bill. The landlord was lettin' them work off his job to pay the rent. And told him to switch the lights in his name. He didn't even do it.

So by me handin' over parts of my Quest card, because I never gained footage after being locked up after bailing [Y.C.] out of jail for being convicted of child neglect, for $200 I had to put my name to that, and now she's on the run and I get all of this out of that? She never - - She ain't - - wouldn't go back to court because I just see her last year. She worked at the same company as I did, I see her there on the 27th and National. She there.

And then this other lady back in - - [L.E.W.], she don't even know her name. She callin' me every day. I'm over by my - - my - - my livin' relatives after I got out of jail, never gained footage, never got a job, never got back to my feet. I know nobody in this courtroom don't care.

And - - And at that one time I didn't care about my $40 that I gave away to the courthouse, I gave away $40 for a marriage license fee and I couldn't even get it back from the courts. And this happened before all of this stuff about bailin' [Y.C.] out of jail. And the courts seemed like this is all my fault? This is not all my fault.

I also talked to [L.E.W.], I sent her a letter last year. And then [Y.C.], I went back to her house after I got out of jail and she still wasn't workin' out right. And then we - - I ended up getting' shot behind all this. I got a bullet hole through my body and laid up at Froedtert Hospital for almost six months out there fightin' for my life because of these people that hates on me.

I can prove it to you that I got the shot, it is right here in my stomach. I got shot, laid up almost 90 days, I was fightin' for my life at Froedtert because I bailed her out.

¶ 3. Smith's defense counsel interrupted the allocution and tried, unsuccessfully, to focus Smith on the present case.

> [Defense counsel]: Excuse me, your Honor. (Brief discussion off the record.)
>
> [Smith]: It's got to be out there. I need to put this out there on the table.
>
> [The Court]: Well, we're going to have to put an end to this because none of this really has a whole lot to do - -
>
> [Smith]: I know it don't have a whole lot, but, here, I didn't set up in jail and then I got out and then I couldn' even stay on my money, and then I get on SSI and stay on it for like four or five checks and then they cut it off. I get these lawyers $2,300 to represent me. They - - I still ain't on for all of this pain and sufferin' that I'm goin' through for not lookin' out for my life after I got my finger injured by my family work helpin' this guy getting' on the job there. And he didn't even have the decency enough to say I will invite you out to dinner for lookin' out for me. He didn't even have the decency to do that for me.
>
> And then [L.E.W.], she come over to my house, I got the settlement from the - - from the gunshot, I buy a car, I take her down there to see her family, she want to run both of us off the highway, kill us both.

¶ 4. The court unsuccessfully warned Smith to "get to the point":

> [The Court]: All right. Well, Mr. Smith, none of this really has anything to do with - -
>
> [Smith]: But this has got a lot to do with this case.
>
> [The Court]: It really doesn't. So we're going to cut it off if you are not going to get to the point.

[Smith]: The point is, if you want to hear what my goal are, my goal is to get out of here to get back to work and to get my Social Security. That's it. You don't want to hear what I gotta say but you want to sentence me, though. You want to give me the maximum time, say that I'm a mean person. But I'm not mean. This place is mean. They took money from me here. And then when I write a letter to my family about it back in Chicago telling them how could I stay in Wisconsin with a stolen car from Chicago here, how could I stay here, how could I stay here, I had to sign my letters that I written to them because these peoples here took my - - took my marriage license fee and then they took my adoption fee. Now, that is not fair to me. You guys are not being fair.

¶ 5. The court eventually stopped the allocution, and finally imposed sentence.

[The Court]: We're done.

[Smith]: I'm done but y'all - - I just want to address - - When I want to talk, y'all don't want to hear the truth.

¶ 6. On June 16, 2010, Smith's postconviction counsel filed a motion to determine Smith's competency to assist in postconviction proceedings. Smith appeared before the postconviction court[2] via video and the court ordered a competency evaluation to be performed by Dr. Deborah Collins of the Wisconsin Forensic Unit. In July 2010, Dr. Collins personally interviewed Smith. Based on her interview, a review of the underlying criminal complaint, a review of Smith's medical records from previous placements at the Wisconsin Resource Center (WRC), and a conversation with Smith's postconviction counsel, Dr. Collins concluded "to a reasonable degree of

[2] The Honorable Jeffrey A. Conen presided over the postconviction proceedings at this point.

professional certainty ... Smith is presently incompetent to proceed." She also opined that with appropriate inpatient treatment he would "more likely than not [] attain a level of functioning which would render him competent." Specifically, Dr. Collins concluded that:

> Mr. Smith repeatedly digressed to circumstantial ramblings intermittent to some moments of productive contributions to the interview ... [a]s the contact progressed, Smith's verbal remarks became increasingly bizarre and [included] evident delusional material regarding case specific information and his identity and circumstances. He appears actively symptomatic within the course of a psychotic disorder at this time.

Dr. Collins also noted that Smith was twice previously treated at the WRC, which Dr. Collins described as a "facility provid[ing] mental health services to inmates due to ... psychiatric problems."

¶ 7. In August 2010, Smith appeared before the postconviction court via video and told the postconviction court that he was competent. The court scheduled the matter for an evidentiary competency hearing. At the hearing,[3] Dr. Collins testified consistent with the findings in her report. The postconviction court found Smith incompetent to assist his postconviction counsel or to understand postconviction proceedings, but found it reasonably certain that Smith could regain competency upon receiving necessary treatment. The postconviction court scheduled a review hearing for December 2010.

¶ 8. Prior to the December 2010 hearing, Dr. John Pankiewicz, also of the Wisconsin Forensic Unit, conducted a three-month review of competency restoration

---

[3] The Honorable Jean DiMotto presided over the evidentiary hearing.

efforts on Smith. Dr. Pankiewicz reviewed the treatment records involving Smith, and interviewed Smith in person. Dr. Pankiewicz noted that, although Smith had made "progress in competency educational efforts," staff reported "continuing problems with his capacity to reasonably discuss the original charges against him, as well as to make rational decisions. He has continued to show problematic symptoms including loose and tangential responses." The interview report included observations that "Smith was intermittently directly responsive to questions" and that "there were occasions where he would go off on tangents irrelevant to the topic at hand." Dr. Pankiewicz reported of the interview in some detail:

> The primary difficulty with Mr. Smith was a recurring reference to his original criminal trial, his claims of miscarriage of justice, false accusations and wrongful prosecution. In the context of discussing his reasoning regarding these issues, he presented delusions with a particular theme. He expressed the belief that a woman with whom he had a car accident with approximately ten years ago, had somehow conspired with various individuals and agencies to get Mr. Smith falsely accused and convicted of sexual assault. It was notable that Mr. Smith would become particularly animated whenever discussing issues of his case. He would often jump to that topic without prompting.

¶ 9. Dr. Pankiewicz concluded that despite some improvement, Smith "continues to suffer from delusions affecting his rational understanding of possible court proceedings. He also continues to suffer some impairment in communication style that would significantly affect his capacity to communicate with . . . counsel or to make rational decisions regarding possible proceedings." Based on the noted improvements, Dr.

Pankiewicz advised that "it is clinically possible that with alterations in treatment regimen, he could gain further improvement in stabilizing his mental illness[,]" but concluded that as of the time of the report, Smith remained incompetent for postconviction purposes.

¶ 10. Dr. Pankiewicz submitted another progress report to the postconviction court in March 2011. The report indicated that Dr. Pankiewicz again interviewed Smith and again reported that Smith could answer some questions in a clear and coherent manner, but was "remarkably delusional" when discussing anything relevant to his criminal case. Dr. Pankiewicz explained this conclusion and provided examples of Smith's delusions:

> As before, Mr. Smith was categorically unable to organize himself with respect to the circumstances he is facing. He has a continued fixed delusion regarding a woman with whom he had a car accident in 1999. He described in disorganized and tangential detail how that accident and some kind of financial award were instrumental in his future prosecution for sexual assault . . . .
>
> . . . .
>
> [Smith] stated his conviction was a consequence of not seeing his probation officer. He then launched into a long and complicated delusional description of a car accident in 1999 in which an unknown woman received $30,000 from [his] employer. [He said] his driver's license [was] put on hold for 20 years.
>
> . . . .
>
> [He believes] that he is incarcerated 'because I used a method of getting my money back' . . . [and] he is

> unable to get his driver's license back until he settles his rape charge and some financial requirement.

(Some formatting altered.)

¶ 11. Dr. Pankiewicz diagnosed Smith as suffering from schizophrenia and polysubstance dependence in remission in a contained environment. He concluded "to a reasonable degree of medical certainty[,]" that Smith had shown virtually no progress in response to education and psychotropic medication, "continues to lack substantial capacity to understand proceedings or assist his attorney in . . . post conviction relief," and was not "likely to regain competency." Dr. Pankiewicz testified consistent with his report at a competency hearing held on March 31, 2011. Dr. Pankiewicz stated that Smith remained fixated on delusions involving an auto accident, $300, an unknown woman, and a driver's license revocation from twenty years past. The postconviction court found Smith remained incompetent to assist in postconviction proceedings, and was unlikely to regain competence in a reasonable time. The court appointed a guardian *ad litem* for purposes of postconviction relief.

¶ 12. In September 2011, Smith's postconviction counsel filed a motion to vacate Smith's judgment of conviction, arguing that Smith was not mentally competent at the time of his trial or sentencing. A report from Dr. Collins dated September 16, 2011, was attached to the motion. In the report, Dr. Collins indicated that she reviewed multiple records, including three competency evaluation reports (one authored by herself and two authored by Dr. Pankiewicz), Smith's available WRC records, Smith's medical records with the Milwaukee County Correctional Facility, the criminal complaint, the sentencing hearing transcript, rel-

evant police reports, and portions of the victim's medical records relevant to the case. The specific findings included, but were not limited to:

- A finding that Smith had a well-documented history of mental illness dating to at least 1993.

- Smith was described in the DOC records as having a "substantial disorder of thought mood perception [which] grossly impairs his judgment, behavior, capacity to recognize reality, and meet the ordinary demands of life."

- Civil Commitment proceedings were initiated by DOC clinical staff.

- Smith had periods of incarceration over the years which provided regular contact with DOC clinical staff. During that time, he was diagnosed with a disorder described as either a "Delusional Disorder" or "Schizophrenia."

- Medical records from the Milwaukee County jail beginning in January 2009, reflect that Smith was exhibiting bizarre behaviors and psychotic symptoms.

- Medical records from the Milwaukee County jail show that on October 25, 2009, Smith was "rambling," appeared " 'out of touch with reality,' " and was physically restrained for exhibiting threatening behaviors towards a corrections officer. Dr. Collins explained in her report that Smith's "evident delusional beliefs were intertwined with his understanding of case related information at the time."

- On October 26, 2009, jail staff noted that Smith was " 'confusing past cases with current,' " "talking to himself," and acting "confrontational."

- Department of Corrections records from January 6, 2010, less than one month after sentencing, show that Smith was "actively psychotic."

- When Smith arrived at the Dodge Correctional Institution after sentencing in this case, records demonstrate that he refused medication for his diabetes because of his fear that nursing staff would "kill him" with shots and by feeding him "whole foods."

- Smith's "thoughts were impenetrable to rational information."

¶ 13. At a hearing on the postconviction motion, the postconviction court[4] expressed skepticism that the defense could raise the issue of competency to stand trial in a postconviction motion, stating "if this opens a door, you can do this on every case then. Defense can do this on every case. Come back and challenge the defense attorney at the time, say he or . . . she didn't raise competency two years later. Oh, now find the doctor." At the status hearing several months later, the State agreed "that Mr. Smith can raise this issue. [Postconviction counsel], on behalf of his client, also argues the defense can raise it and is raising it under three separate theories. I don't have any disagreement with the existence of those theories, so I think this is an issue that we have to litigate." At the request of the State, the court appointed Dr. Pankiewicz to evaluate whether Smith had been competent at the time of trial and sentencing. The postconviction court held an evidentiary hearing on August 2, 2012, and on September 14, 2012.

¶ 14. Both Drs. Collins and Pankiewicz testified at the evidentiary hearing. Consistent with her report, Dr. Collins stated that she interviewed Smith six months after his sentencing and that she found him

---

[4] The Honorable David Borowski now presided over Smith's postconviction matters.

incompetent at that time. She concluded that Smith was actively symptomatic of a psychiatric disorder as early as March 2009–months before his trial. In essence, Dr. Collins concluded that in the months leading up to his trial and at sentencing: Smith refused psychiatric medications, without which he could not function; Smith was out of touch with reality; Smith was delusional and nonsensical in his speech; and Smith confused past cases with his present case. Dr. Collins said that the factors described in her report "all weigh in favor of the conclusion of incompetence."

¶ 15. Dr. Pankiewicz reviewed substantially the same records considered by Dr. Collins, but he did not review Dr. Collins' report before reaching his own conclusions. He did not interview Smith. Consistent with his report, Dr. Pankiewicz testified that Smith had a documented history of mental illness going back at least twenty years. Dr. Pankiewicz testified that Smith's jail records "were a major component in making an assessment . . . of Mr. Smith's state of mind in the fall and winter of 2009." He also said that observations by clinical jail staff and correctional officers "helped to determine that Mr. Smith was suffering symptoms of psychosis at the time of his trial and sentencing." However, Dr. Pankiewicz said an evaluation of the "whole picture," which also included substantial evidence that Smith suffered from mental illness before, during and after his trial, along with Smith's refusal to take medications, and his rambling, disorganized and disturbed speech and thoughts, led to Dr. Pankiewicz's conclusion that Smith was not competent at his trial or sentencing.

¶ 16. Dr. Pankiewicz emphatically rejected the possibility that Smith was faking or exaggerating symptoms of mental illness. He reported that: "There is no

clinical data to suggest that Mr. Smith had been embellishing or feigning symptoms of mental illness throughout . . . his stay at the Milwaukee County jail in 2009 and 2010 prior to his transfer to the Department of Corrections." In addition "Smith's persistent and consistent delusions regarding his legal situation and his trial throughout 2010 and 2011 do not indicate feigning mental illness or embellishing."

¶ 17. The postconviction court denied Smith's postconviction motion on the grounds that defense counsel's belief that Smith was competent was more persuasive than the experts' postconviction evaluations that he was incompetent because neither expert "interviewed the defendant at trial or at sentencing in this matter." The court noted that those who did interact with Smith at the relevant times—namely, Smith's defense counsel and the trial court—did not raise competency concerns and that believing that "people who were not present at the relevant time know more than the people who were present" was the wrong approach to deciding Smith's motion. Because both experts agreed with the court that evaluations contemporaneous with Smith's trial and sentencing would have yielded more "solid" opinions as to Smith's competency, and because no one who interacted with Smith during those times raised a concern, the postconviction court found Smith competent during both trial and sentencing. The postconviction court thus denied Smith's postconviction motion. This appeal follows.

## DISCUSSION

¶ 18. On appeal, Smith argues that the postconviction court erred in finding that Smith was competent during his trial and sentencing. Specifically, Smith raises three separate competency claims: (1) substan-

tive competency; (2) ineffective assistance of defense counsel for failure to raise a competency claim; and (3) procedural competency. We agree with Smith's substantive competence claim and conclude that the record shows a reason to doubt Smith's competence at trial and sentencing. Accordingly, we reverse and remand for a new trial and need not address Smith's other competency arguments.

## Standard of Review.

■■

¶ 19. In Wisconsin, "[n]o person who lacks substantial mental capacity to understand the proceedings or assist in his or her own defense may be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures." WIS. STAT. § 971.13(1) (2011–12).[5] "The [postconviction] court's determination of whether there is reason to doubt the defendant's competence and order an examination is disturbed on appeal only if the [postconviction] court exhibited an erroneous exercise of discretion or if the [postconviction] court decision was clearly erroneous." *State v. Garfoot*, 207 Wis. 2d 214, 223–24, 558 N.W.2d 626 (1997); *see also State v. Byrge*, 2000 WI 101, ¶¶ 4, 44, 237 Wis. 2d 197, 614 N.W.2d 477 (reaffirming the "clearly erroneous" standard of *Garfoot* and according deference to the trial court's competence determination due to the court's opportunity to observe the witness). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Doersching v.*

---

[5] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

*State Funeral Dirs. & Embalmers Examining Bd.*, 138
Wis. 2d 312, 332–33, 405 N.W.2d 781 (Ct. App. 1987).

## Law on Competency.

■■■■

¶ 20. " '[T]he criminal trial of an incompetent
defendant violates due process.' " *Cooper v. Oklahoma*,
517 U.S. 348, 354 (1996) (citation omitted). The basic
test for determining competency was established in
*Dusky v. United States*, 362 U.S. 402 (1960) (per cu-
riam). "A person is competent to proceed if: 1) he or
she possesses sufficient present ability to consult with
his or her lawyer with a reasonable degree of rational
understanding, and 2) he or she possesses a rational as
well as factual understanding of a proceeding against
him or her." *Garfoot*, 207 Wis. 2d at 222. The United
States Supreme Court later expanded the *Dusky* test by
stating that " 'a person whose mental condition is such
that he lacks the capacity to understand the nature and
object of the proceedings against him, to consult with
counsel, and to assist in preparing his defense may not
be subjected to a trial.' " *Garfoot*, 207 Wis. 2d at 222
(quoting *Drope v. Missouri*, 420 U.S. 162 (1975)). Men-
tal illness alone, however, does not necessarily make a
defendant incompetent. *See Byrge*, 237 Wis. 2d 197,
¶ 31.

■■■■

¶ 21. Whenever there is reason to doubt a
defendant's competency to proceed, the court must
proceed under Wis. Stat. § 971.14(1r)(a). *See id.* If a
competency concern is raised by a defendant, the State
bears the burden of proving competency by a greater
weight of the credible evidence. *See Garfoot*, 207
Wis. 2d at 221–22. "[D]etermination of competence is an

individualized, fact-specific decision. It is for this reason that expert testimony regarding a particular defendant's mental capabilities is necessary." *Id.* at 227. Competence is a legal, not a medical, determination. *See Byrge*, 237 Wis. 2d 197, ¶ 50.

¶ 22. Wisconsin has long recognized the occasional need for mental competency evaluations that must be done after the relevant time frame. Although it is recognized that a *nunc pro tunc* determination of a defendant's competency is inherently difficult,[6] such retroactive procedures have been sanctioned in other Wisconsin cases. *See State v. Johnson*, 133 Wis. 2d 207, 224–25, 395 N.W.2d 176 (1986) (supreme court remanded case for retrospective determination of defendant's competency to stand trial although three or four years had passed since trial); *State v. Haskins*, 139 Wis. 2d 257, 267, 407 N.W.2d 309 (Ct. App. 1987) (court of appeals remanded case for retrospective determination of competency). Similarly, retrospective hearings have been sanctioned in other criminal contexts: *State v. Nelson*, 138 Wis. 2d 418, 440–41, 406 N.W.2d 385 (1987) (supreme court approved the use of a retrospective determination of a child's availability in a sexual assault case made eight months after the trial); *Renner v. State*, 39 Wis. 2d 631, 637, 159 N.W.2d 618 (1968) (supreme court remanded case for retrospective determination of whether defendants' confessions were voluntary).

---

[6] *See Pate v. Robinson*, 383 U.S. 375, 387 (1966), where the United States Supreme Court declined to order a retrospective competency hearing noting the difficulty of doing so due to the six-year passage of time, jury inability to observe the subject of their inquiry and inability of experts to testify from anything other than the printed record.

¶ 23. Although obvious hazards attend retrospective competency hearings, including the passage of time, " 'mere passage of time may not make the effort meaningless.' " *Johnson*, 133 Wis. 2d at 225 (citation omitted). In fact, "[t]he passage of even a considerable amount of time may not be an insurmountable obstacle if there is sufficient evidence in the record derived from knowledge contemporaneous to trial." *Id.* (citation and quotation marks omitted). Here, although there was no pretrial competency evaluation done and Smith did not testify at the postconviction hearing, two medical experts each provided evaluations, based on numerous historical and legal documents, concluding that Smith was incompetent at the time of his trial and sentencing.[7] Nonetheless, the postconviction court concluded that Smith's experienced defense counsel, and the judge who presided over both the trial and the sentencing, were in better positions to observe Smith. Because neither raised concerns, the postconviction court concluded that Smith, in fact, was competent both during trial and at sentencing. The postconviction court weighed more heavily the uninformed competence opinions of defense counsel and the trial court—who knew nothing of Smith's extensive mental health history, the DOC records, the jail records or the two experts' opinions—and discounted the experts' evaluations. In so doing, the postconviction court erred. As shown above, with regard to the substantive competence issue, the standard on review is whether the

---

[7] The postconviction court followed the procedures laid out in *State v. Debra A.E.*, 188 Wis. 2d 111, 135, 523 N.W.2d 727 (1994), by appointing a guardian *ad litem* for Smith due to the postconviction evaluations that concluded Smith was incompetent and not likely to regain competence.

whole record reveals a reason to doubt Smith's competence at trial and sentencing. *See Pate v. Robinson*, 383 U.S. 375, 386 (1966). The postconviction court was not the same court who observed Smith at trial and sentencing. The deference accorded the trial court's competence assessment in *Garfoot* and *Byrge* does not apply to the postconviction court here because the basis for that deference does not exist here. *See Byrge*, 237 Wis. 2d 197, ¶ 45 ("Because a competency determination depends on the [trial] court's ability to appraise witness credibility and demeanor, 'there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court.' ") (citation omitted).

¶ 24. Despite acknowledging the expertise of the medical experts multiple times by offering glowing praise, the postconviction court still rejected the experts' reports and testimony because neither the trial court nor Smith's defense counsel raised competency concerns. The postconviction court's rationale is not supported by *Johnson*. *Johnson* does not stand for the proposition that an otherwise competent retrospective evaluation should be rejected simply because experts expressing the present opinion about a defendant's past competency did not interview the defendant during that past time. If the opinion of experts can be rejected because neither expert interviewed the defendant *contemporaneously* with the time in question, then there could never be a retrospective determination of incompetence. That is not the law. *See Johnson*, 133 Wis. 2d at 225.

¶ 25. There was no evidence that either Smith's defense counsel or the trial and sentencing judges were aware of the jail records demonstrating what both experts characterized as psychotic and bizarre behavior

by Smith before and during trial. Yet those facts were known to the experts who testified for both parties, and are undisputed in the record.

¶ 26. Here, the experts' reports and testimony and the DOC and jail records all furnish ample evidence that there is reason to doubt Smith's competence at the time of trial and sentencing. For the forgoing reasons, we reverse the postconviction court, vacate the conviction, and remand for a new trial.

*By the Court.*—Judgment and order reversed and cause remanded.