COURT OF APPEALS
DECISION
DATED AND FILED

June 19, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP387-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2021CF793

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

T.R.T.,

DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Monroe County: RICHARD A. RADCLIFFE, Judge. *Affirmed.*

Before Kloppenburg, P.J., Graham, and Nashold, JJ.

¶1    GRAHAM, J. T.R.T., who was charged with various felonies, appeals a circuit court order that determined that he was incompetent to be tried and committed him to the custody of the department of health services for treatment. T.R.T. does not challenge the portion of the order that found him

incompetent, but rather the portion of the order that determined that, through treatment, it was likely that he would be restored to competency within twelve months. On appeal, the parties dispute the standard of review that should apply to this latter determination and whether the circuit court's determination in this case should be upheld under that standard. Applying the clearly erroneous standard of review, we conclude that the circuit court's determination that T.R.T. would likely be restored to competency through treatment was not clearly erroneous. Therefore, we affirm.[1]

## BACKGROUND

¶2     T.R.T. was charged with repeated sexual assault of a child and other crimes stemming from his alleged conduct between 2017 and 2020. He was subject to pretrial detention in the Monroe County Jail for more than two years following his 2021 arrest, until concerns were raised about his competency.

¶3     Under WIS. STAT. § 971.13(1), "[n]o person who lacks substantial mental capacity to understand the proceedings or assist in his or her own defense may be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures," and a circuit court will order competency proceedings "whenever there is reason to doubt a defendant's competency to proceed." WIS. STAT. § 971.14(1r)(a); *see also* § 971.14(2)-(5). If the court determines that a defendant is not competent but is likely to be restored to competency within a

---

[1] We have prioritized this appeal and expedited our decision pursuant to WIS. STAT. RULE 809.109(5)(b), which sets shorter deadlines for appellate briefing and imposes a deadline on our decision in treatment-to-competency cases.

All references to the Wisconsin Statutes are to the 2023-24 version.

specified timeframe with appropriate treatment, the court "shall suspend the [criminal] proceedings and commit the defendant to the custody of the department [of health services] for treatment." *See* § 971.14(5)(a)1. At that point, the department will be given a limited period of time (twelve months in this case) to attempt to restore the defendant's competency.

¶4 Here, after defense counsel raised concerns about T.R.T.'s competency, the circuit court ordered the department to conduct an examination. The court also scheduled a hearing, at which it would address the following two questions: (1) whether T.R.T. was incompetent (the "competency determination"); and (2) if so, whether there was a likelihood that T.R.T. could, with treatment, be restored to competency within twelve months (the "restorability determination"). *See* WIS. STAT. § 971.14(5)(a). In this context, competency means that the defendant is "capable of understanding the fundamental nature of the trial process and of meaningfully assisting his or her counsel." *State v. Garfoot*, 207 Wis. 2d 214, 217, 558 N.W.2d 626 (1997).

¶5 The circuit court was ultimately presented with the reports and testimony of Dr. Dileep Borra, who was appointed by the court, and Dr. Steven Benson, who was the defense examiner retained by T.R.T. As we now discuss at greater length, Borra opined that T.R.T. was feigning incompetency but was not actually incompetent, and Borra did not offer an opinion on restorability. Benson, in contrast, opined that T.R.T. was incompetent and could not be restored to competency through treatment within the statutory timeframe.

¶6 As explained in Borra's report, Borra's opinion that T.R.T. was competent was based on his psychiatric evaluation of T.R.T., as well as a review of the court record in this case, information obtained from the nursing staff at the

jail where T.R.T. had been housed, and a review of T.R.T.'s criminal history. Borra reported that, during the psychiatric evaluation, T.R.T. frequently responded "I don't know" to questions and exhibited an apparent "inability to provide the most basic information … such as his name, … his date of birth, and his understanding of where he has been staying for the past 2 years." In Borra's opinion, there was a "significant discrepancy" between T.R.T.'s apparent "incapacity to interact with [Borra] during [the] evaluation" and T.R.T.'s evident capacity to interact with the correctional and heath care staff at the jail. Borra further noted that jail records "indicate [that T.R.T.] ha[d] not reported any psychiatric symptoms and ha[d] not displayed any psychiatric symptoms … that would explain the level of impairment" that T.R.T. presented during the evaluation. Based largely on this discrepancy, Borra believed that T.R.T. was "feigning impairment" during the evaluation and that the level of impairment that T.R.T. exhibited in his interactions with Borra was "not consistent with any psychiatric diagnosis."

¶7 Turning to Benson's report, his opinions that T.R.T. was incompetent and not likely to be restored to competency were based on Benson's psychiatric evaluation of T.R.T., as well as psychological testing, a neurobehavioral status examination, a review of T.R.T.'s mental health and medical records, interviews with jail corrections staff, and consultation with defense counsel. Benson diagnosed T.R.T. with intellectual and neurocognitive disorders, including moderate intellectual disability, and major neurocognitive disorder due to chronic inhalant abuse and probable traumatic brain injury. Benson also diagnosed T.R.T. with mental health disorders, including schizoaffective disorder and PTSD. According to Benson, the primary diagnoses of major neurocognitive disorder and schizoaffective disorder "have adversely

4

affected [T.R.T.'s] ability to learn and retain essential information, and to provide relevant details to his attorney during legal proceedings." Benson's assessment of T.R.T.'s "significant neurocognitive deficits" was based in large part on the tests he conducted and were, in Benson's opinion, "neither reversible nor amenable to treatment." Benson's report did not specifically address the treatability of T.R.T.'s mental health disorders, but it did note that T.R.T. was refusing to take antipsychotic medications.

¶8     The circuit court held a hearing, and both doctors gave testimony that was consistent with their reports. A significant focus of the direct and cross-examination of Benson was on his reasons for concluding that T.R.T. could not be restored to competency through treatment due to his severe and permanent major neurocognitive disorder. Benson acknowledged that the mental health disorders are treatable, and particularly, that antipsychotic medications are an effective treatment for schizoaffective disorder. However, Benson opined, T.R.T.'s "brain damage is permanent," and "the problematic issue in this case is that [T.R.T.'s] ability to benefit from treatment is extremely limited by virtue of his extremely inefficient intellectual functions."

¶9     Regarding T.R.T.'s major neurocognitive disorder, Benson testified that the diagnosis was evinced in the tests Benson administered and would manifest "in terms of not being able to complete activities of daily living, not being able to hold a job, [and] not being able to benefit from instruction." Given the severity of the deficits Benson observed, he did not think that T.R.T. would benefit from "insight-oriented psychotherapy," which requires "higher-level cognitive function[ing]." Instead, Benson testified, "[w]e're talking about a much more basic need," and treatment that would be focused on basic life skills:

> [C]an he maintain his hygiene, can he dress himself, can he shower on a consistent basis while being cued to do so, can he choose foods that are going to be nutritious for him, is he able to keep himself clean so that there's no smell or is he able to keep his hair trimmed so that people are able to see what his face looks like[?]
>
> These are all very basic things that we're talking about at this point in time. We're not talking about higher-level cognitive functions that are necessary for therapy.

¶10 Throughout his testimony, Benson made clear that his opinion about restorability was based on the combined effects of the mental health and neurocognitive disorders which, in his opinion, would make it unlikely that T.R.T. would benefit from antipsychotic medication. He stated:

> [I]f it was schizoaffective disorder without the other disorders present, that … could be treated, but … this is not an all-or-none case.
>
> As I testified earlier, we tend to look at things in black or white terms. This is not a black or white case. This is a case in which there are significant and severe and multiple mental disorders and it's the weight of those combined mental disorders that form the basis of my opinion that … these are permanent, they cannot be treated, and that they are not in any way going to be restorable.

¶11 Benson's description of T.R.T.'s major neurocognitive deficits stood in contrast with the testimony of Todd Evers, a correctional officer who worked at the jail. Evers' testimony was presented by the State, and it focused on T.R.T.'s demeanor and ability to care for himself and interact with others in the jail setting. More specifically, Evers testified that, having interacted with T.R.T. "numerous times," he observed T.R.T. exhibit "two different demeanors." On the days of T.R.T.'s competency evaluations, T.R.T. would be "very quiet" with his "head down," which was consistent with the demeanor T.R.T. exhibited on the days that he had court proceedings. However, that "was not consistent with the behavior that [Evers had] seen from [T.R.T.] in the pod housing setting" at the jail. In the

jail setting, Evers had observed T.R.T. "carr[y] on a normal conversation," "interact with other inmates," and take care of daily hygiene issues without prompting. T.R.T. had periodically purchased deodorant, soap, and toothpaste from the canteen. He had also been able to communicate requests to Evers related to housing and medical needs. Some of T.R.T.'s requests were verbal and communicated with direct eye contact, and other requests were written and communicated with coherency, specificity, and proper spelling.

¶12 The circuit court gave an oral ruling in which it determined that T.R.T. was incompetent to proceed. In so doing, the court stated that it found both doctors to be credible, but it gave more weight to Benson's opinion about competency because Benson had performed a battery of psychological and psychiatric testing and considered additional information about T.R.T.'s intellectual functioning. However, the court noted that Benson "did not conduct any standardized malingering test[s]," and the court did not necessarily reject the possibility that T.R.T. might be "malingering or … falsely presenting his behavior for his own purposes."

¶13 Regarding competency, the circuit court noted that the State had the burden to prove by a "greater weight of the credible evidence" that T.R.T. had the present ability to understand the proceedings and participate and assist in his defense, but here, the court "[could not] make that finding." To "make that finding," the court "would have to totally believe Doctor Borra's testimony" that T.R.T. was feigning incompetency "and disregard completely Doctor Benson's testimony." The court reasoned that it could not do so because, in its assessment, T.R.T. "does suffer from a long history of mental health disorders … as well as some intellectual functioning disability." The court further reasoned that it did not have to determine as a clinical matter whether it was the mental health issues, the

7

neurocognitive impairments, or both that were causing T.R.T.'s current functional limitations in order to find it "clear" that T.R.T. was "not currently able to assist in his defense."

¶14    With respect to restorability, the circuit court noted that the statute does not place the burden on either party, and determined that it was likely that T.R.T. will become competent within twelve months with treatment. The court acknowledged Benson's contrary opinion, but did not find it "to be solely determinative." The court relied on the fact that T.R.T.'s mental health disorders were one significant cause of his incompetency, and the evidence suggesting that these mental health disorders were treatable. The court also acknowledged Benson's testimony about T.R.T.'s neurocognitive impairments, but it rejected Benson's opinion that T.R.T.'s "ability to understand will never get any better" because it failed to account for "the impact upon [T.R.T.'s] mental health that [treatment for schizoaffective disorder] can provide." In the court's view, its restorability determination was bolstered by the testimony and reports from jail staff and nursing staff, which suggested that the neurocognitive impairments might not be as profound as Benson believed.

¶15    The circuit court entered an order for commitment for treatment. T.R.T. appeals.

## DISCUSSION

¶16    We begin by discussing the standard of review that is applicable to the circuit court's restorability decision. Our supreme court's decisions in *Garfoot*, 207 Wis. 2d 214, and *State v. Byrge*, 2000 WI 101, 237 Wis. 2d 197, 614 N.W.2d 477, provide some guidance on this topic.

¶17 In *Garfoot*, the circuit court dismissed the criminal charges against the defendant after finding that he was incompetent to be tried and not likely to be restored to competency with treatment. *Garfoot*, 207 Wis. 2d at 219-20. On review, our supreme court acknowledged that, in considering a defendant's competency, the circuit court must ultimately apply a legal test. *Id.* at 223. Even so, the *Garfoot* majority decided that the circuit court's competency determination should be reviewed under the clearly erroneous standard of review. *Id.* at 222-23, 225. In explaining its reasoning, the *Garfoot* majority stated:

> To determine whether the state has met its burden of proving a defendant competent, the [circuit] court must weigh evidence that the defendant is competent against evidence that he or she is not. The [circuit] court is in the best position to decide whether the evidence of competence outweighs the evidence of incompetence…. Although the court must ultimately apply a legal test, its determination is functionally a factual one: either the state has convinced the court that the defendant has the skills and abilities to be considered "competent," or it has not.

> The [circuit] court's superior ability to observe the defendant and the other evidence presented requires deference to the [circuit] court's decision that a defendant is or is not competent to stand trial. Only the [circuit] court has the opportunity to view the defendant. Only the [circuit] court can judge the credibility of witnesses who testify at the competency hearing. Thus, only the [circuit] court can accurately determine whether the state presented evidence that was sufficiently convincing to meet its burden of proving that the defendant is competent to stand trial.

> ….

> We conclude that the same deference should be given to the [circuit] court regarding determinations of competence to stand trial as is given for determinations of competence to represent oneself. Because the [circuit] court is in the best position to observe the witnesses and the defendant and to weigh the credible evidence on both sides, appellate courts should only reverse such determinations when they are clearly erroneous….

9

*Id.* at 222-25 (footnote and citations omitted). The court did not separately consider what standard of review should apply to the restorability determination that was also made in that case.

¶18 In concluding that the clearly erroneous standard would apply in an appeal of a circuit court's competency decision, the ***Garfoot*** majority rejected a contrary position taken in a concurring opinion. *See **id.*** at 229-38 (Abrahamson, J., concurring). More specifically, the ***Garfoot*** majority rejected the position that competency is a question of constitutional fact, and that an appellate court should review the legal question of competency differently, and more independently, than how it reviews factual matters regarding credibility and historical fact. *See **id.*** at 231-32 (Abrahamson, J., concurring).

¶19 Several years later, our supreme court revisited its decision regarding the standard of review of a competency determination in ***Byrge***, 237 Wis. 2d 197. In that case, the defendant, who the circuit court had found competent to be tried, asked the supreme court to reconsider the ***Garfoot*** holding. ***Id.***, ¶¶1, 3. In so doing, the ***Byrge*** majority acknowledged that "[c]ompetency to stand trial constitutes a judicial inquiry, not a medical determination." ***Id.***, ¶31. Even so, it declined to reconsider the standard of review. According to the ***Byrge*** majority, "a competency hearing presents a unique category of inquiry in which the circuit court is in the best position to apply the law to the facts." ***Id.***, ¶4. The majority also observed that the United States Supreme Court "classifies competency to stand trial within a discrete category in which the resolution of the legal issue is better left to the [circuit] court." ***Id.***, ¶44. "In the interest of uniformity and consistency in constitutional decision making," the ***Byrge*** majority stated, Wisconsin courts should continue to apply the clearly erroneous standard of review to competency decisions made by the circuit court. ***Id.***, ¶45. *See also*

*State v. Smith*, 2016 WI 23, ¶26, 367 Wis. 2d 483, 878 N.W.2d 135 (referring to a competency determination as "functionally a factual finding").

¶20    Turning to the present appeal, T.R.T. argues that, unlike competency, restorability should be treated differently as a mixed question of law and fact.    That is, when reviewing the circuit court's determination about restorability, T.R.T. argues that an appellate court should defer to the circuit court's findings of fact, but should independently review whether a defendant is likely to be restored to competency with treatment.    T.R.T. points out that the question of "treatability" of mental health conditions is at issue in civil commitments under WIS. STAT. § 51.20, and in those cases, the issue is reviewed as a mixed question of law and fact.    *See Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783.    From that, T.R.T. argues that it would be appropriate to review the judicial decision of restorability in competency proceedings under the same standard.

¶21    In response, the State cites the law on involuntary medication orders, which requires a court to determine that medication is "substantially likely to render the defendant competent to stand trial."    *Sell v. United States*, 539 U.S. 166, 181 (2003).    The State points out that, although Wisconsin courts have not decided this issue, a majority of federal appeals courts review that determination under the clearly erroneous standard of review.    *See United States v. Diaz*, 630 F.3d 1314, 1330-31 (11th Cir. 2011).

¶22    Whatever the merits of these analogies to other legal contexts might be, when it comes to competency determinations, we are not writing on a blank slate.    Although no Wisconsin case directly addresses the standard of review of a restorability determination, we find *Garfoot* and *Byrge* to be instructive.

11

¶23 It is true that the *Garfoot* court did not specifically state that it was applying the clearly erroneous standard when reviewing a restorability determination, but restorability was at issue in *Garfoot*, and the majority did not suggest that a standard other than clearly erroneous should apply to restorability. If we were to conclude that a different standard applied, our conclusion should be based on some key distinction between the two inquiries.

¶24 T.R.T. does not persuasively identify any such distinction. He argues that, unlike with a competency determination, an appellate court is in as good a position as a circuit court to evaluate the record evidence, but this is not necessarily the case. With regard to restorability, a circuit court must evaluate how the defendant presents, and must also evaluate the credibility of the medical testimony about the likelihood that various treatments will be successful, as the court did in this case.

¶25 T.R.T. also suggests that restorability is more of a "medical/psychological determination" than a judicial one because it involves a psychologist's assessment about whether a defendant's condition can be improved. Yet, if that characterization were accurate (and we do not necessarily agree that it is), it would actually undermine T.R.T.'s argument about the appropriate standard of review. That is because it would reinforce the conclusion that restorability is a factual finding that the circuit court is in the best position to make, and that we would review under the clearly erroneous standard.

¶26 In conclusion with respect to the standard of review, we are not persuaded that we should review the restorability determination under a different standard than the competency determination. To do so would introduce a confusing lack of conformity and consistency in this area of law. *Cf. Byrge*, 237

Wis. 2d 197, ¶¶38-45. We therefore conclude that, following the logic of *Garfoot* and *Byrge*, we will apply the clearly erroneous standard to the restorability determination at issue in this appeal.

¶27 Applying that standard, we conclude that the circuit court's restorability determination was not clearly erroneous. Here, as shown above, *supra* ¶¶12-14, the court's determination was based on evidence that was presented at the hearing, and the court provided reasons for its determination that are logical and consistent with the record facts. Although the court found that T.R.T. was not competent, it did not discount the possibility that T.R.T. might be exaggerating the effects that his various disorders had on his cognition and ability to understand, process, and remember information. Benson's testimony provided evidentiary support for the determination that T.R.T.'s mental health disorders were, generally speaking, of a kind that are amenable to treatment, and the court was not persuaded by Benson's opinion that T.R.T.'s neurocognitive deficits were so permanent and profound that treatment of the mental health disorders would be ineffective.

¶28 The circuit court's reasons for rejecting Benson's ultimate opinion on restorability find support in the record. The court had reason to determine that, with treatment for T.R.T.'s mental health disorders, the only remaining barrier to competency would be T.R.T.'s neurocognitive disorder. As stated, Benson opined that T.R.T.'s neurocognitive disorder was untreatable, and that the resulting deficits were so profound that they would cause T.R.T. to struggle with basic activities of daily living. Yet, even if the court credited Benson's testimony that the neurocognitive disorder was untreatable, the court could also credit Evers' testimony that T.R.T. could carry on a normal conversation and did not have trouble maintaining his hygiene, dressing himself, or keeping himself clean in the

correctional setting. Thus, the court had reason to question the reliability of Benson's assessment of the severity of T.R.T.'s neurocognitive deficits, which was a factual predicate of Benson's opinion on restorability.[2] If the neurocognitive deficits were less profound than Benson believed, the court could reasonably determine that, although the neurocognitive disorder could not be treated, it would not, standing alone, be so profound as to prevent T.R.T.'s competency from being restored once the mental health disorders were treated. Accordingly, the court's determination is not "against the great weight and clear preponderance of the evidence," nor is it "totally unsupported by the facts."[3]

¶29 T.R.T. makes several related arguments to the contrary, with the upshot of these arguments being that the circuit court erred when it disregarded Benson's opinion about restorability. We are not persuaded.

¶30 First, it appears that T.R.T. may be arguing that the circuit court was bound to accept Dr. Benson's opinion on restorability because Benson was the only expert to offer an opinion on that issue. Yet, restorability is closely tied to competency, which, as noted, is a judicial determination rather than a medical one.

---

[2] T.R.T.'s appellate briefing seems to misconstrue the import of Evers' testimony. T.R.T. asserts: "Sgt. Evers' testimony was largely intended to indicate that T.R.T. did not suffer from a mental illness." Whatever was intended by the testimony, the circuit court could have reasonably relied on Evers' testimony to conclude that some of the factual predicates of Benson's assessment of the neurocognitive function were incorrect.

[3] There appear to be two different formulations of the clearly erroneous standard. Generally, a finding is clearly erroneous if it is "against the great weight and clear preponderance of the evidence." *Lowe's Home Centers, LLC v. City of Delevan*, 2023 WI 8, ¶25, 405 Wis. 2d 616, 985 N.W.2d 69. However, our supreme court has applied a different and potentially higher formulation in the competency-to-stand trial context. *See State v. Smith*, 2016 WI 23, ¶30, 367 Wis. 2d 483, 878 N.W.2d 135 (providing that a competency determination is clearly erroneous if it is "totally unsupported by the facts"). We need not determine whether the standard from *Smith* also applies to the restorability determination because the circuit court's determination in this case is not clearly erroneous under either formulation of the standard.

*See Byrge*, 237 Wis. 2d 197, ¶31. Thus, the court was not required to accept Benson's opinion on the matter, and here, the court reasonably rejected that opinion because it was built on a factual predicate about T.R.T.'s level of functioning that was contradicted by other facts in the record.

¶31 Next, T.R.T. argues that the circuit court was required to accept Benson's opinion based on the specific nature of a restorability determination. Although T.R.T. acknowledges that, generally speaking, a circuit court is not required to accept the testimony of any expert, *see Smith*, 367 Wis. 2d 483, ¶55, T.R.T. asserts that restorability is a matter of "prognosis," which is uniquely within the province of medical experts. Therefore, he contends, once the court accepted Benson's opinion about T.R.T.'s diagnosis, it was likewise required to accept Benson's opinion on prognosis unless there was sufficient evidence to suggest another outcome.

¶32 There are at least two problems with this argument. First, it appears that the circuit court did not fully accept Benson's opinion on diagnosis. That is, the court credited Benson's diagnosis of schizoaffective disorder and PTSD, and also appeared to credit Benson's determination that T.R.T. had some degree of "intellectual functioning disability." However, it did not necessarily credit Benson's diagnosis about the severity of the neurocognitive disorder, given what the court knew about T.R.T.'s ability to function in the jail setting. Second, given the court's concerns about the factual predicates on which Benson's prognosis was based, it was appropriate for the court to draw its own conclusions about the likelihood that T.R.T. could be restored with appropriate treatment. In other words, there were reasons for the court to adopt certain aspects of Benson's opinion and to reject others, and here, the court persuasively explained its reasons for doing so.

¶33     Finally, T.R.T. contends that the circuit court should not be allowed to "cherry pick information" in an expert report, but we do not see the court's rationale as an example of "cherry-picking." Rather, as stated, the court examined the reasons that Benson gave for concluding that T.R.T.'s competency could not be restored and found them unpersuasive.

¶34     For all of the reasons explained above, we affirm the circuit court's decision with respect to T.R.T.'s restorability.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.